EXHIBIT B

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CIVIL ACTION NO. 07-CV-00029-RPM-PAC

_____

DEPOSITION OF:  GRACE COWAN
EXAMINATION DATE:  October 9, 2007

_____

BUCK MALOY MELTON,

Plaintiff,

v.

CITY OF GUNNISON, COLORADO; OFFICER RONALD MOORE,
Individually; and OFFICER GRACE COWAN,
Individually,

Defendants.

_____

        PURSUANT TO NOTICE, the deposition of
GRACE COWAN was taken at 10:16 a.m. on October 9,
2007, at 201 W. Virginia Avenue, Gunnison,
Colorado, before Lisa Persichitte Reed, Certified
Realtime Reporter and Notary Public in and for
the State of Colorado, said deposition being
taken pursuant to the Federal Rules of Civil
Procedure.


            Lisa Persichitte Reed
          Certified Realtime Reporter

Multi-Page™

Page 11

1  with that arrest; is that correct?
2       A  I was there when he made the
3  arrest, yes.
4       Q  You were there, okay.  Where were
5  you when he made the arrest?
6       A  At the end of the contact?
7       Q  Mm-hmm, the end of the contact.
8       A  Well, when he placed Mr. Melton
9  in the back of the vehicle, I was sitting in the
10  passenger seat.
11       Q  Okay.  Now, do you recall how
12  long or how much time had passed from the initial
13  contact until the time Mr. Melton was arrested?
14       A  I don't recall that.
15       Q  Okay.  What was your role on the
16  January 2nd stop?
17       A  I was acting -- well, at the
18  time, I was just patrolling with Officer Moore
19  that morning.  When he made the initial contact
20  with Mr. Melton, I was acting as a cover officer.
21       Q  Okay.  And describe for me what
22  it means to be a cover officer.
23       A  When you are a cover officer, you
24  basically act to protect you, the officer that is
25  making the initial contact, and the defendant

Page 12

1  from any other -- anything that would escalate.
2       Q  Okay.
3       A  From any danger.
4       Q  Okay.  Now, tell me what
5  happened -- well, just go ahead and take me from
6  the beginning to the end of your January 2nd
7  contact with Mr. Melton.  And I'm talking about
8  the one you did with Officer Moore.
9       A  Okay.  Do you want me to include
10  when we saw the vehicle?
11       Q  Sure.
12       A  Okay.  I was patrolling with
13  Officer Moore in the early morning hours.  It was
14  about 8:30 a.m.  We were heading southbound on
15  Wisconsin in the 200 block of Wisconsin Street.
16  And I observed a blue Mazda vehicle heading
17  eastbound in the -- approaching the intersection
18  of Virginia and Wisconsin go through a stop sign.
19       At that time, Officer Moore decided to
20  pull the vehicle over in the 100 block of West
21  Virginia.  He just pulled the vehicle over
22  parallel to the street.
23       Officer Moore exited his vehicle.  I
24  exited along with him.  And I approached the
25  passenger side of the vehicle near the passenger

Page 13

1  door and acted as the cover officer while Officer
2  Moore made the contact with Mr. Melton at the
3  time.
4       Traffic was fairly loud at that time.
5  I couldn't hear everything that Officer Moore was
6  asking of Mr. Melton; however, I did hear him say
7  to roll down the window several times.  At the
8  time, Mr. Melton had rolled the window down a
9  couple inches when Officer Moore made the initial
10  contact.
11       He eventually made -- or he eventually
12  rolled the window down.  And what I observed of
13  Mr. Melton was him reaching for some papers in
14  the glove compartment and he pulled out several
15  pieces of paper.  I remember one being a yellow
16  piece of paper he was going to hand to Officer
17  Moore.  I just observed Mr. Melton to be nervous.
18  His hands were shaking.
19       And once Officer Moore made the
20  contact, he returned back to his vehicle to
21  obtain information on the driver's license.  I
22  went around the back end of the vehicle to
23  observe Mr. Melton at that time.  I did not -- I
24  don't remember having a conversation with Mr.
25  Melton at that time.  I could smell the odor of

Page 14

1  alcoholic beverage coming from the vehicle at
2  that time.
3       Officer Moore, once he made his contact
4  with dispatch, came back out and contacted Mr.
5  Melton, asked him to get out of the vehicle.  He
6  came out of the vehicle.  The observation I made
7  at that time was it appeared he had used the
8  vehicle door for balance.
9       And then Officer Moore took him to the
10  sidewalk on the south side of the street and
11  asked him if he would be willing to perform some
12  voluntary roadside maneuvers.  Mr. Melton agreed
13  to participate in those.  And Officer Moore began
14  asking him a series of questions and then he
15  began to perform the nystagmus on Mr. Melton.  I
16  wasn't able to watch that maneuver completely
17  because I was watching other traffic as well.  He
18  completed those.
19       And then he was explaining the walk and
20  turn to Mr. Melton.  Mr. Melton seemed to say
21  that he didn't understand the maneuvers.  And
22  Officer Moore attempted to have him go through
23  the walk and turn and then he stopped the walk
24  and turn at that point and advised Mr. Melton he
25  was under arrest for further investigation of a

Page 11 - Page 14

Page 19

1 intoxilyzer room?
2     A   Mr. Melton, myself, and then
3 Officer Moore.
4     Q   Okay.  Was there anyone else
5 present?
6     A   No.
7     Q   You are positive of that?
8     A   Not that I remember.
9     Q   Okay.  And let me back up just a
10 second to the police car.  The police contact and
11 you are pulling him over, was that police car
12 equipped with video equipment?
13     A   I know that vehicle has video
14 equipment in it now.  However, I don't know if it
15 had it then.
16     Q   Okay.  Do you know whether any of
17 that contact was videotaped?
18     A   I don't know.  That would be
19 something you would have to try to obtain.
20     Q   Okay.  Who would know?
21     A   Who would know about that?
22     Q   Yes.
23     A   The case file should have that
24 information if an arrest was made.  Generally, if
25 there was a video or audio, it would be placed in

Page 20

1 the case file.
2     Q   Police case file?
3     A   Mm-hmm.
4     Q   Okay.  Who would place that in
5 there?
6     A   Well, the officer would
7 originally do it, and Captain Robinson would be
8 the one, because it would be held as evidence, he
9 would be the one that would be responsible for
10 it.
11     Q   And would that be your
12 responsibility or Officer Moore's responsibility
13 to make a note of that in the case file?
14     A   That would be Officer Moore's.
15 He is the arresting officer.
16     Q   Okay.  Back to the room where the
17 intoxilyzer is.  Do you have cameras in that
18 room?
19     MR. ZIPORIN:  Object to form and
20 foundation.  Again, we're talking about the jail
21 as opposed to --
22     Q   (BY MR. McDERMOTT)  Let me
23 rephrase.  Are there cameras in that room?
24     A   Not that I'm aware of.
25     Q   Not that you are aware of.  How

Page 21

1 far away is the intoxilyzer room from the booking
2 desk?
3     A   There really isn't a booking
4 desk.  There is an elevator in the Gunnison
5 County jail where the jailers come down.  The
6 jail is up above.  And then basically, the
7 arrestee sits in a chair there until they come
8 down to continue with the booking.
9     Q   Okay.  Is there a camera in that
10 booking area?
11     A   Yes, there is.
12     Q   There is?
13     A   (Nodding head.)
14     Q   Okay.  Do you know whether that
15 camera was operating on January 2, 2006?
16     A   I don't know.
17     Q   Okay.  Have you ever seen a
18 videotape from January 2, 2006?
19     A   I have not.
20     Q   Okay.  In the intoxilyzer room,
21 what did you observe between Mr. Melton and
22 Officer Moore?
23     A   Well, I observed them talking to
24 each other.  I don't remember the conversation.
25 Do you want me to go into what I saw of the

Page 22

1 notice of revocation?
2     Q   Sure.
3     A   Okay.  I just observed they were
4 both sitting.  Officer Moore was explaining the
5 expressed consent affidavit and notice of
6 revocation to Mr. Melton.  At the time, he had
7 refused all chemical testing.  And that is where
8 I became aware of it that I remember.  And he,
9 Mr. Melton, refused to sign the form after
10 Officer Moore explained it to him.
11     Q   What did Officer Moore --
12 describe for me what you heard Officer Moore say
13 when he described the expressed consent form to
14 Mr. Melton.
15     A   What did he say?
16     Q   Yes.
17     A   When the officer explains this,
18 he writes out a little summary of what occurred.
19 He explains that to him.  And then he explains
20 that there was a refusal done.  And then he
21 explained the bottom part of the revocation and
22 then asked -- you know, and I don't know this for
23 sure verbatim what he said to have him sign the
24 form.
25     Q   And that is my question.  Do you

Multi-Page™

Page 23

1 remember what he actually said on January 2nd or
2 are you assuming he said these things because
3 that's what you would expect him to do?
4        A   No, I was there when he was
5 explaining the form. I can't give you word for
6 word how he explained it, but I was there when he
7 refused to sign the form.
8        Q   And where did you -- where did
9 this happen?
10       A   In the intoxilyzer room.
11       Q   Okay. And what did Mr. Melton
12 say when he refused to sign the form?
13       A   I don't remember what he said.
14 He said he wasn't going to sign the form.
15       Q   Okay. Do you remember Mr. Melton
16 saying anything else with respect to whether he
17 was going to sign that form or not?
18       A   No.
19       Q   Okay. Did you see Officer Moore
20 write on this form "in-custody refusal"?
21       A   Yes, I was there.
22       Q   Was Mr. Melton in handcuffs at
23 this time?
24       A   I can't remember.
25       Q   Okay. Do you remember when the

Page 24

1 cuffs were put on Mr. Melton?
2        A   They were placed on him after he
3 was told he was under arrest for further
4 investigation into DUI.
5        Q   Okay. Did you hear any
6 discussion during that initial stop about
7 chemical testing?
8        A   I do not remember him -- I don't
9 remember any conversation there.
10       Q   Okay. Could a conversation have
11 taken place during the traffic stop with respect
12 to chemical testing?
13           MR. ZIPORIN: Object to form.
14       A   Generally, when an officer has
15 made an arrest and puts the person in the back of
16 the patrol vehicle, that is when expressed
17 consent is advised.
18       Q   (BY MR. McDERMOTT) And so I'm
19 clear, that generally happens when the suspect is
20 placed in the car, correct?
21       A   Yes.
22       Q   And you don't remember hearing
23 that discussion in this particular case?
24       A   I don't.
25       Q   Okay. My question is: Could

Page 25

1 that discussion have taken place and you simply
2 don't remember it?
3        A   Oh, yeah, definitely.
4        Q   Do you remember when the
5 handcuffs were taken off of Mr. Melton?
6        A   No, I don't.
7        Q   Okay. Is it fair to say you
8 don't remember whether Mr. Melton was in
9 handcuffs or not when he had this discussion with
10 Officer Moore about this form?
11       A   That's fair to say. He was
12 handcuffed at the scene. And I don't remember
13 whether or not he removed them or not -- or
14 Officer Moore did.
15       Q   Now, when an officer marks
16 "refusal" on that line that says, "signature of
17 respondent," they are generally referring to
18 refusal to take a chemical test; is that
19 accurate?
20       A   Let me see.
21           MR. ZIPORIN: Object to form.
22       A   No. When Officer Moore writes
23 down "in-custody refusal," he is meaning he is
24 refusing to sign.
25       Q   (BY MR. McDERMOTT) And how do

Page 26

1 you know that?
2        A   I guess personally what --
3 Officer Moore writing that, I don't know that.
4 However, in my training and experience, that's
5 how I would do it.
6        Q   Okay. So if you write
7 "in-custody refusal," you are indicating that
8 they are refusing to sign the form?
9        A   Yes.
10       Q   Okay. How many times have you
11 written "in-custody refusal"?
12       A   Out of all the DUIs I've had, I
13 have not had someone refuse chemical testing.
14       Q   You've never had anyone refuse
15 chemical testing?
16       A   I haven't. I've been very lucky.
17       Q   So when you say that's what you
18 would do, you've never actually done it?
19       A   Well, in my training and
20 experience, that is what I would do.
21       Q   But you have no active cases
22 where you've actually done that?
23       A   (Shaking head.)
24       Q   Okay. How many -- do you have an
25 idea of how many DUI citations you've issued?

Multi-Page™

Page 35

1 training with Officer King. Is it one training
2 you are referring to or a series of trainings?
3       A   Well, he was my FTO as well as he
4 trained me in SFSTs.
5       Q   And how long was your training
6 for SFST?
7       A   I think it was -- I can't
8 remember completely, but I think it was a
9 three-day course.
10      Q   Three-day course?
11      A   Yeah.
12      Q   Okay. And that was all done by
13 Officer King?
14      A   Mm-hmm, yes.
15      Q   And Officer King was employed by
16 Gunnison?
17      A   Yes.
18      Q   He was a Gunnison police officer?
19      A   Yes.
20      Q   Okay. Now, this three-day course
21 was sometime in 2001?
22      A   Yes.
23      Q   Do you recall if it was early on
24 in your career or was it a few months after you
25 had begun?

Page 36

1       A   Well, it was right after I got
2 out of FTO. And I believe I was out of the
3 program in May. And it was soon after that. I
4 can't be specific on dates.
5       Q   That's fine. I completely
6 understand. And the three-day course, is it
7 three days in a row or is it spread over a period
8 of time?
9       A   It was in a row.
10      Q   Okay. And that's where they
11 teach you how to do the standard field testing,
12 correct?
13      A   Mm-hmm, yes.
14      Q   And how many tests were you
15 trained to do in this three-day course?
16      A   How many tests?
17      Q   Mm-hmm.
18      A   We went over the roadside
19 maneuvers. Do you want those specifically?
20      Q   Sure.
21      A   Okay. He went over Romberg. He
22 went over nystagmus, the horizontal gaze
23 nystagmus; walk and turn; and the one-leg stand
24 were the sobriety tests that we went over.
25      Q   Okay. How much time was devoted

Page 37

1 to each?
2       A   I can't remember.
3       Q   Okay. Did any one of these tests
4 get more attention than the other?
5       A   Yes, actually, the horizontal
6 gaze nystagmus specifically because --
7       Q   It is a more complicated test?
8       A   Exactly.
9       Q   And it was during this three-day
10 training that Officer King instructed you on the
11 use of the expressed consent form?
12      A   He went over the revocation
13 sheet.
14      Q   Okay.
15      A   Or form.
16      Q   And tell me what he trained you
17 about with respect to that.
18      A   Well, he went over the form and
19 what was required of every officer on the top.
20 Let me see the form real quick.
21      Q   Sure.
22      A   Over the top of the form, how to
23 write your little summary on the form and then
24 where you need to mark if there is a refusal or
25 if a person has, you know, at the time, it was a

Page 38

1 .1 or more; and then whether or not you are going
2 to surrender that license; whether or not you are
3 going to give a temporary permit and have the
4 person sign the revocation, and have you sign it.
5 And then when they sign it, that acts as the
6 temporary permit within those seven days and they
7 have it until they have a hearing with the State.
8       Q   What did he tell you about
9 whether you were going to issue a temporary
10 permit or not?
11      A   If the person refuses to sign the
12 affidavit is whether or not somebody gets a
13 temporary permit or not.
14      Q   Now, that particular copy does
15 not have a back sheet. Let me show you this
16 piece of paper. Is that what is supposed to be
17 on the back side of the expressed consent form?
18      A   It looks familiar.
19      Q   Okay. Does it look like that is
20 what is on the back of the expressed consent
21 form?
22      A   On the very back?
23      Q   Mm-hmm.
24      A   Yes.
25      Q   Can you tell me whether that

Multi-Page™

Page 43

1 personally," close quote, as opposed to "shall
2 issue a temporary permit," which is in the
3 subsequent section.
4     MR. McDERMOTT: Thank you for
5 pointing that out. I apologize. I underlined
6 the wrong "shall."
7     Q (BY MR. McDERMOTT) Okay. I'm
8 going to read this into the record. And it's
9 actually 42-2-126, subsection (b). And it states
10 when the law enforcement officer serves the
11 notice of revocation, the officer shall take
12 possession of any driver's license issued by this
13 state or any other state, which is held by the
14 person. When the officer takes possession of a
15 valid driver's license issued by this state or
16 any other state, the officer acting on behalf of
17 the department shall issue a temporary permit,
18 which is valid for seven days after its date of
19 issuance.
20     Officer Cowan, is it fair to say that
21 your understanding of whether to issue a permit
22 or not is different than what I just read to you?
23     A Yes.
24     Q Okay. In your words, can you
25 explain to me how your understanding differs from

Page 44

1 what is in the statute?
2     A On the revocation affidavit here,
3 it states if a person -- a peace officer and the
4 person that was arrested must sign the notice in
5 order to get a temporary permit. That's what my
6 understanding of that is. This, my
7 understanding, is what it states in the statute,
8 "shall issue a temporary permit, which is valid
9 for seven days after its date of issue."
10     Q Would you agree with me that the
11 way the statute reads, it doesn't leave you with
12 a choice as to whether to issue the permit or
13 not?
14     A I guess the word "shall" is kind
15 of grey, but from this and this, they contradict
16 each other.
17     Q Okay. Let's talk about the word
18 "shall," and I do understand what you are saying.
19 Have you ever discussed that discrepancy with
20 Officer King?
21     A No.
22     Q Okay. Were you aware of that
23 discrepancy on January 4, 2006?
24     A No.
25     Q When did you first become aware

Page 45

1 of that discrepancy?
2     A The criminal trial.
3     Q The criminal trial?
4     A Yes.
5     Q And I take it that was when his
6 criminal lawyer had pointed out the discrepancy?
7     A Yes.
8     Q You obviously never -- excuse me.
9 That discrepancy was never brought to your
10 attention by the city attorney's office up here,
11 right?
12     A No.
13     Q And I take it from what you've
14 said prior to that criminal trial, none of the
15 other officers discussed that discrepancy; is
16 that correct?
17     A No.
18     Q I'm going to go ahead at this
19 time and play the audio that we were provided
20 from your stop. And I just want to go over
21 some -- ask you some questions about that, okay?
22     A Okay.
23     MR. ZIPORIN: Now, are we going
24 to do that off the record?
25     MR. McDERMOTT: Yeah, you don't

Page 46

1 have to transcribe. Actually, let's keep this
2 part on the record for just a second. Eric, I
3 made an extra, do you want me to admit it as an
4 exhibit or do you care?
5     MR. ZIPORIN: I don't care. My
6 only concern was whether or not you wanted her to
7 get it into the record or not. And it is your
8 call. It is your deposition.
9     MR. McDERMOTT: I tell you what,
10 you do not have to transcribe. I will go ahead
11 and ask to mark this when we're done.
12     Do you recall what exhibit number we
13 ended with at our last deposition?
14     MR. ZIPORIN: I don't, but I can
15 make a call. Why don't we start with Cowan
16 No. 1.
17     (Audio played off the record.)
18     Q (BY MR. McDERMOTT) Now, Officer
19 Cowan, there is a voice on there. And at the
20 outset of the call, somebody describes a driver's
21 license as being clear and valid; is that
22 correct?
23     A Yes.
24     Q Was that the dispatcher?
25     A Yes.

Attorneys Service Center
(303) 295-DEPO

Case No. 1:07-cv-00029-RPM   Document 27-3   filed 01/31/08   USDC Colorado   pg 8 of 8

Multi-Page™

**Page 47**

1   Q   And then they asked you whether
2 they should check that, correct?
3   A   Yes.
4   Q   And you indicated "Negative. I
5 am pretty sure he is not valid"; is that correct?
6   A   Yes.
7   Q   Now, later on in the call,
8 somebody says that he was not given a temporary
9 permit and his license was surrendered?
10   A   Yes.
11   Q   Whose voice is that?
12   A   The dispatcher.
13   Q   Okay. Do you know what record
14 she was relying on when she obtained that
15 information?
16   A   I can speculate because I wasn't
17 down there when she was reviewing it. She has a
18 computer of our files down there that she can
19 look up.
20   Q   Okay. And so she -- explain that
21 to me. What is the computer of your files?
22   A   Our files are under -- it's
23 called records management. It is an ITI system
24 and she has access to those files -- our reports,
25 those files in the report.

**Page 48**

1   Q   And so your educated guess would
2 be that she pulled Officer Moore's report and saw
3 that Officer Moore had not issued him a temporary
4 permit?
5   A   Yes.
6   Q   All right. Do you know what she
7 would have been looking at at the outset of the
8 call when she said it comes back clear and valid?
9   A   The CCIC computer.
10   Q   And tell us exactly what the CCIC
11 computer is and what information it has in it
12 with respect to driver's licenses?
13   A   CCIC. And I guess they can also
14 look at -- NCIC computer has all the information
15 that is from, like, the Colorado Department of
16 Revenue licensing, driver's license, and plate
17 numbers. It also has information on wants for
18 people. And it also has information on criminal
19 histories for people.
20   Q   Okay.
21   A   Stolen vehicle information and so
22 forth.
23   Q   Okay. And so it would have
24 been -- you believe it would have been that
25 database that she was looking at when she

**Page 49**

1 initially said it was clear and valid?
2   A   Originally, yes.
3   Q   And more likely than not, it was
4 a Gunnison police report that she was looking at
5 when she said the temporary permit was not given?
6   A   Yes.
7   Q   Okay. You indicated in the call,
8 "Negative. I am petty sure he's not valid."
9 This may seem redundant, but why did you say
10 that?
11   A   Why did I say that?
12   Q   Yes.
13   A   The reason I asked for that
14 information is for a case, for evidentiary
15 purposes. The reason I said that after she said
16 that he was clear and valid is because of my
17 knowledge on January 2nd that Officer Moore did
18 not provide him a temporary license permit.
19   Q   You stated that -- I believe it
20 is your voice on there that says he has a history
21 of resisting and obstructing?
22   A   Yes.
23   Q   How were you aware of that
24 history -- his history of resisting and
25 obstructing?

**Page 50**

1   A   From the prior call of Officer
2 Ron Moore.
3   Q   The January 2nd call?
4   A   Yes.
5   Q   Were you referring to anything
6 else?
7   A   No, that is what I became aware
8 of when he was provided a criminal history. On
9 every arrestee, dispatch prints out a history and
10 that is given to the officer. And I was aware at
11 that moment when I was with Officer Moore on the
12 date of the 2nd of that history.
13   Q   Okay. To the best of your
14 recollection, what was his history?
15   A   I remember him having a few DUIs
16 and an obstructing/resisting. I can't remember
17 exactly which one. That's all I remember.
18   Q   Okay. And that's what you are
19 referring to in that call?
20   A   Mm-hmm, yes.
21   Q   All right. When did you first
22 know the name Buck Melton?
23   A   The day that Officer Moore pulled
24 him over.
25   Q   January 2nd?

Attorneys Service Center
(303) 295-DEPO

Page 47 - Page 50