EXHIBIT D

*BRUNO REPORTING COMPANY*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-CV-00029-RPM-PAC

DEPOSITION OF BUCK MALOY MELTON

OCTOBER 2, 2007

BUCK MALOY MELTON,

Plaintiff,

v.

CITY OF GUNNISON, COLORADO; OFFICER RONALD MOORE, individually, and OFFICER GRACE COWAN, individually.

Defendants.

APPEARANCES

FOR THE PLAINTIFF:      SEAN M. McDERMOTT, ESQ.
                        McDermott, Hansen & McLaughlin, LLC
                        1890 Gaylord Street
                        Denver, Colorado 80206

FOR THE DEFENDANTS:     ERIC M. ZIPORIN, ESQ.
                        Senter Goldfarb & Rice, LLC
                        1700 Broadway
                        Suite 1700
                        Denver, Colorado 80290

COPY

*899 Logan St.
Suite 208
Denver, CO
80203
303 / 831-1667
Fax / 831-4432*

SHARON HAWLEY
BRUNO REPORTING COMPANY
303-831-1667

Page 78

1  any controlled intersections eastbound on Virginia
2  between location No. 7 and location No. 4?
3       A    No stoplights, if that's what you're
4  referring to.
5       Q    Are there any stop signs?
6       A    There are, but I think there's only one.
7  And it would be right here, and then this is kind of a
8  straight shot. And then the stop signs are here, and
9  then there's a stoplight right here.
10      Q    So on location 7 to location 4, the only
11 controlled intersection would be at location No. 4?
12      A    Yes.
13      Q    Now, did you stop at the stop sign at
14 location 4?
15      A    Yes.
16      Q    Did you go through that intersection at
17 all before you came to a complete stop?
18      A    Like I said, my car slid. I'd slowed
19 down quite a bit. I didn't have the car for very long,
20 so I wasn't real used to the car. But yeah, I slid
21 through the stop sign all of about 2 or 3 feet.
22      Q    What happened next?
23      A    Well, I sat there, because I'd seen the
24 police officers were sitting there, and they had the
25 right of way to go and refused to go anywhere. So I

Page 79

1  sat there for several minutes until a big white truck
2  pulled up behind me, a white truck, four-wheel drive.
3       Q    You sat there for several minutes?
4       A    Yeah. And at that point, I kind of had
5  to go, so I just went through to the stoplight, and the
6  officer pulled in behind me.
7       Q    You had to go because there was a car
8  behind you?
9       A    Yeah.
10      Q    So you continued eastbound, then, and
11 there's a stoplight at the intersection of Main and
12 Virginia?
13      A    Yes.
14      Q    And what color was that traffic signal as
15 you approached?
16      A    It was red.
17      Q    So did you stop at that intersection?
18      A    Yes.
19      Q    And as you went through the intersection
20 of Virginia and Wisconsin, did the police vehicle
21 follow you?
22      A    Yes, he pulled in behind me.
23      Q    What was your assumption at that time?
24      A    Obviously, I'm going to be pulled over.
25      Q    Why was it obvious to you?

Page 80

1       A    Because he was staring at me, and I sat
2  there for two or three minutes.
3       Q    So what was your understanding, then, of
4  why you were about to be pulled over?
5       A    Initially, I was kind of curious because
6  I found the whole situation odd, so I figured I'd get a
7  ticket for something about a stop sign.
8       Q    So the light turns green, what do you do
9  next?
10      A    As soon as it turned green, I started to
11 go. But he turned the police lights on, and like I
12 said, at that point, I figured I'd get pulled over.
13      Q    And you pulled into location No. 5?
14      A    Yeah. All of the streets here are
15 parking and kind of out.
16      Q    From the time you had woken up that
17 morning to the time you got in your vehicle, had you
18 had any alcohol to drink that morning?
19      A    No.
20      Q    Were you still intoxicated from the night
21 before?
22      A    No.
23      Q    When you went to bed the evening before,
24 did you consider yourself to be intoxicated?
25      A    No.

Page 81

1       Q    When you went to bed the evening before,
2  did you think you were legally able to operate a motor
3  vehicle?
4       A    The question didn't come into my mind.
5       Q    Sitting here today, based upon how you
6  felt when you went to bed on January 2, 2006, do you
7  think you would have been above the legal limit to
8  drive a vehicle at that time?
9       A    I wouldn't say yes, but I wouldn't say
10 no. It's more along the lines of why would I be going
11 anywhere at that hour.
12      Q    My question wasn't whether or not you
13 would have chosen to drive, my question is: If, in
14 fact, you had driven prior to going to bed on the
15 morning of January 2, 2006, do you think you would have
16 been above the legal limit to do so?
17           MR. McDERMOTT: I'm going to object to
18 the form. There's impaired and there's intoxicated,
19 and I'm objecting to the form of the question.
20      A    It would have been a real debate. If I
21 had blown or this or that or been pulled over, whether
22 it would have been legal or not. But it wouldn't have
23 been far from. I mean, I wouldn't have driven anywhere
24 that night. I was going to bed.
25      Q    (BY MR. ZIPORIN) Were you hung over the

21 (Pages 78 to 81)

## Page 118

1  refused to do a chemical test of your breath or blood
2  later; is that correct? Answer: Yes."
3        Did you give that testimony at trial on
4  June 2, 2006?
5    A  I did. And in the context of the
6  question, it was as though I were refused the
7  opportunity to do that.
8    Q  I'm sorry. Could you explain that to me.
9    A  Well, the way that you read the question,
10  and the way that they were stating it at trial, they
11  were stating it in the car. Did I refuse, and I didn't
12  so much state that I refused, but that I was refused.
13  The officer held up the Breathalyzer thing, as I
14  stated, on the way to the police department and asked
15  me only at that time, Do you want to blow in this? And
16  he was just laughing, and it wasn't so much a question
17  as he's being sarcastic and set it down.
18    Q  On page 121, lines 12 through 24, did you
19  give -- were you asked these questions and did you give
20  these answers: Question: Okay. And you testified
21  earlier that you were given the option of a breath or
22  blood test but that you refused to do those, correct?
23  Answer: Yes, I did. Question: Okay. Why did you
24  refuse to do those? Answer: Well, it was completely
25  after the fact at that point. I was arrested. I was

## Page 119

1  sitting in the back of the car, and we were pretty well
2  en route to the police station, and, um, he kind of
3  asked me as a formality, you know, do you want to do a
4  blood or breath test or whatever, and I just said no.
5  When we got to the police station, and one of the gals
6  there, one of the sheriffs, I guess, she asked me the
7  same question. And I was sitting there and the
8  officer, he had been in the police station for a while,
9  and he just walked by and told her that I had refused.
10  That she said, fine, and then just kind of turned
11  around. I didn't say anything, but she just turned
12  around and started filling out paperwork."
13    A  Okay.
14    Q  Is that truthful and accurate testimony
15  that you gave at the trial on June 2, 2006?
16    A  Yes.
17    Q  Did Officer Moore at any point in time
18  during your entire contact with him explain Colorado
19  express consent law to you, that you had the option to
20  take tests, but if you refused to take tests, your
21  license would be revoked?
22    A  That's ambiguous. Again, he stated a lot
23  of things and went through things really quick. So
24  when it comes to implied or whatever that is consent,
25  I'm not real sure about that. I don't think that he

## Page 120

1  did, actually. But like I said, he went through a lot
2  of things really fast.
3    Q  So you don't recall one way or the other?
4    A  The only time that he brought up blowing
5  in anything was when I was in the squad car and I was
6  already under arrest.
7    Q  The question was with regard to whether
8  or not he explained to you Colorado express consent law
9  and the tests that could be conducted and the
10  consequences for your refusal to take those tests?
11    A  Among all the things that he asked, I
12  don't believe that he brought that up.
13    Q  And you're certain of that?
14    A  Well, I mean, there's the whole part
15  about why I didn't sign this form or whatever for the
16  driver's license and whatever. So I'm not real sure if
17  I'm mistaking what you're asking for what he did. But
18  I don't believe he did the implied consent or whatever
19  that was.
20       (Deposition Exhibit 4 was marked for
21  identification.)
22    Q  I'm handing you now what's been marked as
23  Deposition Exhibit 4, and ask you if I can identify
24  that.
25    A  It generally looks like a police report,

## Page 121

1  but I'm not real sure.
2    Q  I'll represent that it's an express
3  consent affidavit and notice of revocation. Do you
4  recall seeing this before?
5    A  I'm not real sure. I should probably ask
6  you, is this the form I signed for the license?
7    Q  This is the form that you refused to
8  sign.
9    A  That's what I thought. He never
10  really -- he explained part of this.
11    Q  Which part did Officer Moore explain to
12  you?
13    A  Sign here, and that was pretty well it.
14  And at that point, after being told I'm on the list and
15  this and that, I wasn't real interested in signing
16  anything without reviewing it.
17    Q  So you refused to sign Exhibit 4?
18    A  At the time and within the time frame
19  that he'd stated, I think that I stated somewhere else
20  that if I'd had an opportunity to spend some time and
21  read things and understand them, then I probably would
22  have signed whatever.
23    Q  When Officer Moore asked you to sign
24  Exhibit 4, you refused to sign it, correct?
25    A  Yes.

Page 130

1  minutes, and the guy kept blowing through all these
2  things. And then they just hand this to me and say,
3  Sign, and I'm, like, sign what? And they're, like,
4  Well, he refused. And that's just how it is. Like,
5  what are you supposed to do?
6      Q   I want to refer to your trial testimony
7  one more time. Counselor, it's page 131, lines 9
8  through 11. Do you recall being asked this question
9  and giving this answer: "Question: He," referring to
10 Officer Moore, "also told you that he wasn't issuing
11 you a temporary permit, correct? Answer: Yes."
12          Was that truthful and accurate testimony
13 at the time you gave it?
14     A   Yeah. Although, I haven't . . .
15     Q   When Officer Moore asked you to sign a
16 form, did you say anything along the lines of, I'm not
17 signing anything that says I'm drunk?
18     A   No. The only thing I said was that I'm
19 not going to sign something without the ability to read
20 it and understand it.
21     Q   Now, you posted a $750 bond for the DUI
22 arrest, correct?
23     A   Yes.
24     Q   Was that all cash out-of-pocket by you?
25     A   Yes.

Page 131

1      Q   And that bond prohibited any illegal
2  conduct on your part, correct?
3      A   I'm not sure of that, but I would assume,
4  I guess.
5      Q   Let's just quickly mark this as an
6  exhibit.
7          (Deposition Exhibit 5 was marked for
8  identification.)
9      Q   I'll represent to you that that is the
10 appearance bond for DUI arrest in the amount of $750.
11 There in handwriting "prohibits use of alcohol or
12 commission of any illegal acts." Do you see that?
13     A   Yes.
14         MR. McDERMOTT: For the record, I'm
15 objecting to foundation and hearsay.
16         MR. ZIPORIN: What's the foundation
17 objection?
18         MR. McDERMOTT: The handwriting on there.
19 And it's fine for the deposition, but I don't know
20 where this handwriting came from.
21     Q   (BY MR. ZIPORIN) And that's your
22 signature there in the middle of the page, Mr. Melton?
23     A   Yes.
24     Q   And when you signed that, you fully
25 understood the conditions of the appearance bond?

Page 132

1      A   I would dispute whether I fully -- no, I
2  probably didn't have time to read it, so no, I probably
3  didn't understand everything on this sheet of paper.
4      Q   Why did you sign it?
5      A   To get out of jail.
6      Q   Do you know who filled out this
7  paperwork?
8      A   I think it was one of the sheriffs at the
9  thing, but I'm not super sure. I think it was one of
10 the sheriffs.
11     Q   Did one of the sheriffs attempt to
12 explain to you the conditions of the appearance bond
13 before you signed it?
14     A   No. Just sign here. Here's your stack
15 of paper. There's the door.
16     Q   Sitting here today, what is it about
17 Exhibit 5 that you don't understand?
18     A   I have to sit here and read the thing. I
19 don't know. It says I'm supposed to appear in court,
20 the date, blah, blah, time, get a felony, mandatory
21 restraining order. I don't know. I don't understand
22 it sitting here. These are legal terms.
23     Q   But you signed it nonetheless?
24     A   Yeah.
25     Q   Now, when you left the Gunnison County

Page 133

1  Jail, were you under the impression that you could
2  drive?
3      A   Yes.
4      Q   And the issue of your license being
5  revoked in your prior DUIs had not come up because at
6  those occasions, you had consented to either a blood or
7  breath test, correct?
8      A   Yes.
9      Q   So why is it that you believed, when you
10 left the Gunnison County Jail, that you could still
11 drive your vehicle even after being arrested for DUI?
12     A   Well, it's to my understanding, and
13 correct me if I'm wrong, but the 911 dispatcher stated
14 that.
15     Q   But that was on January 4, 2006. My
16 question to you is: When you left the jail following
17 your DUI arrest, you had it in your mind you could
18 drive still, correct?
19     A   Yes.
20     Q   Why did you have that belief, was that
21 given your prior experience with your other two DUIs?
22     A   Well, they've changed the laws, and
23 again, I'd asked -- Peyton Smith had just dealt with
24 this, and he stated, and Jon concurred, that I could
25 drive until the DMV hearing. But I went -- and I saw