**EXHIBIT H**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CIVIL ACTION NO. 07-CV-00029-RPM-PAC

---

DEPOSITION OF:  GREG ANDERSON
EXAMINATION DATE:  October 9, 2007

---

BUCK MALOY MELTON,

Plaintiff,

v.

CITY OF GUNNISON, COLORADO; OFFICER RONALD MOORE,
Individually; and OFFICER GRACE COWAN,
Individually,

Defendants.

---

PURSUANT TO NOTICE, the deposition of
GREG ANDERSON was taken at 8:38 a.m. on October
9, 2007, at 201 W. Virginia Avenue, Gunnison,
Colorado, before Lisa Persichitte Reed, Certified
Realtime Reporter and Notary Public in and for
the State of Colorado, said deposition being
taken pursuant to the Federal Rules of Civil
Procedure.


Lisa Persichitte Reed
Certified Realtime Reporter

1    A   This particular one, no, I don't.
2    Q   And when I say, "issued," I mean
3  when the Department of Revenue gave it to you
4  guys and instructed you to use that?
5    A   I don't know when that was.
6    Q   Okay. When they send you new
7  forms, what instructions do they give you with
8  respect to it?
9    A   They basically say to discard the
10 old forms and use the new forms. That is what
11 they tell you.
12   Q   And that's it?
13   A   It depends. If there is a
14 pertinent change that requires more discussion,
15 usually, they will actually have -- the person
16 that does the specific area of training that is
17 affected by it will come out and do some type
18 of -- maybe it's a paragraph of training or maybe
19 it's just a short discussion, but they will
20 usually do some type of training to make sure
21 that whatever the change is that they are
22 instituting, that it's been covered by them so
23 you know why you are doing something differently
24 when you've done something in the past.
25   Q   And who provides that training?

1  Is it someone from the Department of Revenue or
2  do they leave it up to you guys to train on that?
3    A   Again, it just depends what it
4  is. If it's just, you know, instead they want a
5  middle name versus the middle initial, you know,
6  the full middle name, then that is just something
7  they would send us by e-mail or send by mail and
8  say, "Please note the change on this form and
9  make sure you annotate this appropriately."
10   Q   Okay. Since you've been the
11 chief here, has the Department of Revenue or the
12 Department of Transportation ever sent someone
13 out here to provide specific training?
14   A   Not that I'm aware of, no.
15   Q   Okay. Can you tell me what your
16 understanding is of what your officers are
17 supposed to do in the event somebody they pull
18 over either refuses testing or has a high breath
19 test? What are they supposed to do with respect
20 to that form in that particular case?
21   A   If they pull somebody over and
22 the individual refuses to either participate or
23 cooperate in the testing or they refuse to
24 provide blood, saliva, urine, breath, one of
25 those things, then they have to follow this

1  protocol, which clearly states that their
2  driver's license -- their driving privilege would
3  be revoked and that they are to follow the form
4  verbatim right down the line to the point where
5  it talks about you need to make sure that you
6  communicate to them that you have the right to
7  request a hearing under 42-2-126; and that yes,
8  it is possible they may be granted a temporary
9  permit, which would be good up to the first
10 hearing date. And, again, it is reiterated.
11         And when you talk about surrendering
12 their driver's license, if they surrender their
13 driver's license, then the officer may issue a
14 temporary permit for their use, which would be
15 good for seven calendar days after the date of
16 the notice.
17         And lastly, if they -- if the offender,
18 the driver, whatever, if he -- there has to be
19 two things for the temporary permit to be valid
20 according to the paragraph as I read it and have
21 read it; that they have to make sure that they,
22 as the driver or the person that's been stopped,
23 that they sign it. And the peace officer also
24 has to sign that document to make sure their
25 temporary permit is valid.

1    Q   Okay. And you used the word
2  "may" issue a temporary permit. Is that your
3  understanding from the form or is there any other
4  basis for that understanding?
5    A   Well, it is actually from two
6  places. One is the form from the Department of
7  Revenue, Form DR-2576. And also, I will tell you
8  that that's the protocol that is followed. And
9  after the lawsuit was filed, I immediately
10 checked with our instructor in this, Sergeant
11 Warren Brown, verified what the protocol was. I
12 also checked with Lakewood Police Department to
13 verify what their protocol was.
14   Q   And tell me, what did Sergeant
15 Brown tell you?
16   A   Sergeant Brown stated that their
17 protocol was as stated right here on the DR-2576,
18 that the officer may issue a temporary permit
19 given these other requirements.
20   Q   Did Sergeant Brown indicate when
21 it was okay not to issue a temporary permit?
22   A   Yes, he did. When a subject
23 wouldn't sign the temporary permit, he wouldn't
24 get the temporary permit because it would be in
25 violation of the form.

Page 39

1    Q   Okay. Did he say whether it was
2 a refusal to sign the permit -- excuse me, did he
3 specify whether it would be a refusal to sign the
4 temporary permit or a refusal to do chemical
5 testing? That's a bad question. Let me ask it
6 this way: Did he say whether -- if somebody
7 refused chemical testing, would the officer then
8 be permitted to just say, "I'm not going to give
9 you a permit"?
10    A   At all times -- I didn't ask him
11 that question, no.
12    Q   Okay. Did that come up at all
13 or --
14    A   No, I specifically asked him if
15 an individual refuses to sign the temporary
16 license, does he still get a driver's license. I
17 specifically asked him that.
18    Q   Okay. Did you talk about what
19 would happen if someone refused to sign a form
20 when they were initially pulled over, but then
21 after the fact, they did wish to sign a form?
22    A   I didn't, no.
23    Q   Did Sergeant Brown ever indicate
24 to you where he got his understanding about the
25 discretion to issue a permit or not issue a

Page 40

1 permit?
2    A   Sergeant Brown mentioned to me
3 that they follow the DR-2576 protocol.
4    Q   Okay. And I'm sorry, just so I'm
5 clear, Sergeant Brown is with the Gunnison Police
6 Department or he is the one from Montrose?
7    A   No, he is with the Montrose
8 Police Department.
9    Q   But he is the one who does
10 provide training to the Gunnison Police
11 Department with respect to this area?
12    A   Most recently, he has been. He
13 is not the only one that can. He is just the
14 most recent one that we've used.
15    Q   Okay. Do you know who would have
16 trained Officer Cowan with respect to this form
17 and how to use it?
18    A   Well, Officer Cowan was initially
19 trained when she was a young police officer by --
20 well, she has been trained by two people. One is
21 Officer King, who is no longer with our police
22 department, but he did do the initial training
23 with her. She has also had other trainings too
24 in this area. And that would have been with
25 Sergeant Warren Brown as well.

Page 41

1    Q   Okay. Do you know where Officer
2 King is now?
3    A   I believe he is in Texas law
4 enforcement. I don't know which jurisdiction
5 specifically.
6    Q   And approximately, when did he
7 leave your department?
8    A   My estimate?
9    Q   Yeah.
10    A   My estimate was -- I believe it
11 was February of '05.
12    Q   Okay. Who from the Lakewood
13 Police Department did you talk to about this
14 form?
15    A   Unfortunately, I don't recall his
16 name.
17    Q   Do you remember what rank he had?
18    A   I believe it was a lieutenant --
19 no, I take it back. It was a sergeant.
20    Q   Okay. And did you call him or
21 did he call you?
22    A   No, I called him.
23    Q   Okay. Can you tell me what you
24 specifically asked him?
25    A   I specifically called him up

Page 42

1 after this lawsuit was filed to ask him what
2 their protocol was in regards to the DR-2576.
3    Q   And tell me how he responded.
4    A   He mentioned that they followed
5 the protocol on the DR-2576 verbatim.
6    Q   Was there anything more to the
7 discussion?
8    A   I asked him specifically if an
9 individual refused to sign the form, would he
10 still get a temporary permit. And that is the
11 time that he stated if they don't follow the
12 form, if they refuse to sign the temporary
13 permit, they do not get a temporary permit to
14 drive.
15    Q   Okay. Was the conversation
16 general like that or did you get any more
17 specific with, for instance, when a person
18 refused to sign the form or anything like that?
19    A   I specifically asked him when a
20 driver refuses to sign, you've worked down
21 through the form with the driver and you've asked
22 him to sign the temporary permit, if they don't
23 sign it, what happens, is what I asked him. He
24 said, "They don't get a temporary permit if they
25 don't sign it."

Page 43

```
 1      Q  Okay.  Here is kind of -- here is
 2  what I want to know a little bit about:  If the
 3  person is drunk, they are less likely to
 4  understand what they are signing.  Would you
 5  agree with me?
 6      MR. ZIPORIN:  Object to
 7  foundation.
 8      A  I would say it's not up to us as
 9  police officers to determine how incapacitated a
10  person is when they are under the influence.  It
11  is our responsibility to follow the law.  The law
12  provides us clear guidelines that we are to
13  follow regardless of -- we're not put in a
14  position of -- to judge.  We're not a person that
15  understands the form.  We are given the
16  responsibility to go through the form with them
17  and explain it to them.
18      Q  (BY MR. McDERMOTT)  Okay.  Do
19  your officers ever explain it to them after the
20  person has been booked and has had some time to
21  sober up?
22      A  You are asking me if my officers
23  do that?
24      Q  Yes.
25      MR. ZIPORIN:  Object to form.
```

Page 44

```
 1      A  I would have a hard time
 2  answering that question.  I mean, other than the
 3  fact the normal time that you ask the questions
 4  is when you are going through the DR-2576.  It
 5  would not be later on.
 6      Q  (BY MR. McDERMOTT)  When would be
 7  the normal time that you would go through the
 8  form?
 9      A  The normal time you go through
10  this form is when you are processing a subject.
11  You are trying to get him to -- you are trying to
12  process him.  You attempt to get him to take the
13  Breathalyzer test.  And if someone refuses that,
14  then you would then go to this form right here,
15  the DR-2576, and work down through this and make
16  sure he understands what is going on because this
17  is a legal document per the State of Colorado, if
18  that helps.
19      Q  So your understanding is that the
20  appropriate time to go through that form would be
21  during the stop and potential arrest of the
22  subject?
23      A  No, you would not do it during
24  the stop.  During the stop, you need to make sure
25  that the individual is properly secured, that his
```

Page 45

```
 1  safety concerns are taken care of, as well as
 2  your own.  Out on the street is not the place to
 3  be filling this form out.
 4      Q  Okay.  Then I do understand.
 5  When you say, "process," you mean during the
 6  booking process?
 7      A  Yes, sir, that is correct.  That
 8  is what I mean.
 9      Q  Okay.  So down at the station
10  rather than on the street?
11      A  That is correct.
12      Q  Okay.  When a person -- well, let
13  me ask this:  If a person is arrested, to your
14  knowledge, what would happen to the form that
15  they were issued during the police contact?
16      A  What would happen to the form?
17      Q  That was served on them.  Would
18  it go into property -- would it go into their
19  property or would it go into the cell with them?
20      A  I believe that they get a copy of
21  the form.  Obviously, the original would go into
22  our files, the case file.  It would go into the
23  case file.
24      Q  Okay.  And the copy that was left
25  with the person who was booked, would it go into
```

Page 46

```
 1  the cell with them?  Would it be held in property
 2  for them to retrieve when they are released, do
 3  you know?
 4      A  Well, normally when a person is
 5  booked, if a person is booked into jail, is being
 6  held in jail, he is not allowed to keep his
 7  personal property on him.  The jail would then
 8  secure that property for him.
 9      Q  Okay.  And then he would be able
10  to retrieve it when he was released?
11      A  Actually, it should be put in his
12  property at that point in time.
13      Q  Okay.  When he got it out of
14  property, do the officers go over it with him
15  again or not?
16      MR. ZIPORIN:  I'm going to object
17  to foundation just to the extent that the
18  Gunnison County Jail is where they are.  There is
19  no city jail.
20      A  Yeah, that is correct.  The
21  Gunnison County Jail would be -- their person
22  would be processing him.  Once we book the
23  subject or book the person into jail, we're not
24  involved with that process any longer.
25      Q  (BY MR. McDERMOTT)  Then it's the
```