**EXHIBIT 3**



# MINITRANSCRIPT

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO
### CIVIL ACTION NO. 07-CV-00029-RPM-PAC

**DEPOSITION OF: GRACE COWAN**
**EXAMINATION DATE: October 9, 2007**

BUCK MALOY MELTON,

Plaintiff,

v.

CITY OF GUNNISON, COLORADO; OFFICER RONALD MOORE, Individually; and OFFICER GRACE COWAN, Individually,

Defendants.

### APPEARANCES

SEAN M. McDERMOTT, ESQ.
ERIC ZIPORIN, ESQ.

Multi-Page™

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CIVIL ACTION NO. 07-CV-00029-RPM-PAC

---

DEPOSITION OF:  GRACE COWAN
EXAMINATION DATE:  October 9, 2007

---

BUCK MALOY MELTON,

Plaintiff,

v.

CITY OF GUNNISON, COLORADO; OFFICER RONALD MOORE,
Individually; and OFFICER GRACE COWAN,
Individually,

Defendants.

---

PURSUANT TO NOTICE, the deposition of GRACE COWAN was taken at 10:16 a.m. on October 9, 2007, at 201 W. Virginia Avenue, Gunnison, Colorado, before Lisa Persichitte Reed, Certified Realtime Reporter and Notary Public in and for the State of Colorado, said deposition being taken pursuant to the Federal Rules of Civil Procedure.


Lisa Persichitte Reed
Certified Realtime Reporter

Attorneys Service Center
(303) 295-DEPO

Multi-Page™

**Page 3**

1     P R O C E E D I N G S
2         GRACE COWAN
3     The deponent herein, being first duly
4  sworn to testify to the truth in the above cause,
5  was examined and testified on her oath as
6  follows:
7         E X A M I N A T I O N
8  BY MR. McDERMOTT:
9     Q   Good morning.
10    A   Good morning.
11    Q   For the court reporter, would you
12 please give her your name?
13    A   My name is Grace Lynn Cowan.
14    Q   Okay. And you are currently a
15 police officer in Gunnison; is that correct?
16    A   Yes, I am.
17    Q   And what is your rank?
18    A   I'm just a patrol officer.
19    Q   Okay. And how long have you been
20 a patrol officer?
21    A   It will be seven years in
22 January.
23    Q   Okay. In a little while, I will
24 want to talk a little bit more about your law
25 enforcement background. For the time being, I

**Page 4**

1  just want to go ahead and start off with the
2  January 4th arrest that you made of Mr. Melton,
3  okay?
4     A   Okay.
5     Q   And that was January 4, 2006,
6  correct?
7     A   Correct.
8     Q   Okay. And my understanding is
9  that the arrest occurred at about 3:25 p.m.; is
10 that correct?
11    A   Correct.
12    Q   Do you know how much time elapsed
13 from the time you pulled Mr. Melton over until
14 the time he was placed under arrest?
15    A   I don't know the exact time. I
16 would have to look.
17    Q   Okay. Now, my understanding is
18 that you pulled Mr. Melton over because you
19 believed that he was driving and that he did not
20 have a valid driver's license; is that correct?
21    A   Correct.
22    Q   Now, your knowledge about
23 Mr. Melton came from your stop of him with
24 Officer Moore two days earlier; is that correct?
25    A   Yes.

**Page 5**

1     Q   Now, outside of that, you didn't
2  observe Mr. Melton on January 4th breaking any
3  traffic laws; is that correct?
4     A   No, sir.
5     Q   Okay. He was pulled over solely
6  because you believed he was not entitled to drive
7  at that time?
8     A   Yes, sir.
9     Q   Now, when you pulled Mr. Melton
10 over, you told him why you were pulling him over.
11 Is that fair to say?
12    A   Yeah.
13    Q   Tell me what you told him when
14 you pulled him over.
15    A   Normally, I advise him on the
16 contact and I told him I believed he didn't have
17 a valid driver's license.
18    Q   Okay. And had you called for
19 Officer Brown to back you up at this point or did
20 you call on Officer Brown after the initial
21 contact?
22    A   I called him before.
23    Q   My understanding is that Officer
24 Brown was not present during this initial
25 contact, though; is that correct?

**Page 6**

1     A   The initial being with Ron Moore?
2     Q   I'm still talking about the
3  January 4th stop of Mr. Melton. When you first
4  went up and advised Mr. Melton of the reason for
5  your contact, you were by yourself; is that
6  accurate?
7     A   Yes.
8     Q   Okay. Now, Mr. Melton told you
9  that he thought he had a temporary permit,
10 correct?
11    A   Yes.
12    Q   And he handed you paperwork
13 indicating why he thought he had a valid permit.
14 Is that fair to say?
15    A   He handed me the revocation form
16 that was provided to him by Officer Moore.
17    Q   And that's the same form that we
18 were talking about earlier with Chief Anderson,
19 correct?
20    A   Correct.
21    Q   I'm going to go ahead and just
22 show you a copy of the expressed consent notice
23 that was in his criminal discovery in the DUI
24 case. Is that a copy of what Mr. Melton handed
25 you?

Page 7

1  A  Yes.
2  Q  Okay. Now, Mr. Melton also told
3  you that he had contacted a lawyer; is that
4  correct?
5  A  Yes, he did.
6  Q  And that that was part of the
7  basis for his belief that he had a temporary
8  permit?
9  A  Yes.
10  Q  Was Mr. Melton cooperative with
11  you at this point?
12  A  Yes, he was.
13  Q  Did he raise his voice in any
14  way?
15  A  No.
16  Q  Now, in your report -- well, let
17  me back up just a moment.
18    Did you write your report with respect
19  to this contact right after the arrest?
20  A  Normally, we write our reports
21  right after you make an arrest or within that
22  day.
23  Q  Okay. Do you recall if it was
24  right after or later that day?
25  A  You know, I can't recall. I

Page 8

1  don't know if I had calls afterward or not.
2  Q  But it was no later than that
3  day?
4  A  Right. We have a 24-hour hold.
5  Basically, we have to get it done within 24
6  hours.
7  Q  Okay. Now, your report states
8  that Mr. Melton, and I'm quoting, Mr. Melton had
9  refused all chemical testing and was not given a
10  seven-day temporary permit. Mr. Melton was
11  arrested on January 2, '06, on the charges of
12  driving a vehicle while under the influence of
13  alcohol and a minor traffic violation. Is that
14  accurate? And if you need me to give you the
15  second page of your report, I'm happy to do that.
16  Actually, it is the second page of your
17  affidavit.
18  A  If it's in my report, it would be
19  accurate.
20  Q  All right. And it was your
21  belief that Officer Moore had not issued him a
22  permit because he had refused the chemical
23  testing on that January 2nd stop; is that
24  correct?
25  A  That, and he refused to sign the

Page 9

1  sheet.
2  Q  Now, at the time of January 4th,
3  did you believe that Officer Moore's refusal to
4  issue a permit had something to do with the
5  chemical test or the fact that Mr. Melton had not
6  signed the form?
7  A  He hadn't signed the form of the
8  revocation sheet. And the chemical test, he
9  refused.
10  Q  Your report does not mention
11  Mr. -- your report does not state that Officer
12  Moore refused to issue a permit because Mr.
13  Melton refused to sign the expressed consent
14  form.
15  A  Okay.
16  Q  Is that accurate?
17  A  Well, if it states that in my
18  report, then that's what I wrote.
19  Q  Okay. Well, the reason stated in
20  your affidavit, and I'm just going to read this
21  sentence, "Mr. Melton had refused all chemical
22  testing and was not given a seven-day permit."
23  A  Okay.
24  Q  Is that an accurate description
25  of your understanding of why Mr. Melton was not

Page 10

1  issued a permit as it was on January 4th?
2    MR. ZIPORIN: Object to form and
3  foundation.
4  A  In my PC affidavit, what I
5  understand is he refused all chemical testing and
6  didn't sign the form. In my report, however, it
7  doesn't state I said he refused to sign.
8    MR. ZIPORIN: He is talking about
9  your affidavit now.
10  A  Okay, in the affidavit.
11  Q  (BY MR. McDERMOTT) In the
12  affidavit.
13  A  I don't know why it's not in
14  there.
15  Q  Okay. Now, I want to back up to
16  January 2nd. And you were on patrol with Officer
17  Moore; is that correct?
18  A  Yes.
19  Q  Were you and he -- well, you and
20  he were in the same car, correct?
21  A  Yes.
22  Q  And you were there when he pulled
23  Mr. Melton over?
24  A  Yes, I was.
25  Q  And you assisted Officer Moore

Page 27

1   A   I couldn't count.
2   Q   You couldn't count because you
3 don't remember or --
4   A   Yeah, I don't know.
5   Q   You don't know, okay. Are you
6 able to approximate?
7   A   Twenty.
8   Q   Do you remember what Mr. Melton
9 said after he had indicated that he wasn't going
10 to sign the form?
11   A   No.
12   Q   Was he booked -- or not booked.
13 Was he put into jail shortly after this?
14   A   Yes, he was.
15   Q   Now, Officer Moore told Mr.
16 Melton that he would not be able to drive from
17 this date forward, correct?
18   A   Correct.
19   Q   Do you remember the exact words
20 that he used when he articulated that?
21   A   No.
22   Q   Do you remember where he was when
23 he articulated that to Mr. Melton?
24   A   When he was explaining the
25 revocation, they were sitting in the intoxilyzer

Page 28

1 room.
2   Q   Okay. Now, where did Mr. Melton
3 surrender his driver's license?
4   A   He surrendered it with Officer
5 Moore in that room.
6   Q   In that room?
7   A   And it may have been Officer
8 Moore had already had his license, so it's not
9 like he just handed it over.
10   Q   Do you remember when Officer
11 Moore first took his license?
12   A   That was at the traffic stop.
13   Q   Okay. So when you say he
14 surrendered it in the intoxilyzer room, tell me
15 what you mean by that.
16   A   Well, it would be a surrender of
17 his license because of the refusal on the
18 affidavit.
19   Q   But Officer Moore already had
20 possession of the driver's license, correct?
21   A   I can't say that for sure, but he
22 did have it at the initial contact.
23   Q   Okay. He had a valid driver's
24 license at the initial contact?
25   A   When he ran his information, yes.

Page 29

1   Q   Right. Everything was clear.
2 Mr. Melton was lawfully driving -- or he had a
3 valid driver's license when he was pulled over on
4 January 2nd?
5   A   I wasn't there when he received
6 the information from dispatch. I'm assuming he
7 did.
8   Q   You are assuming he did?
9   A   I didn't hear that information
10 come across dispatch.
11   Q   But Officer Moore told him from
12 that date forward, you can't drive?
13   A   Yes.
14   Q   He did not tell him, "You're
15 going to be able to apply for a hearing with the
16 Department of Revenue. You have seven days to do
17 that," correct?
18   A   I'm sorry?
19   Q   That's fine. He did not tell Mr.
20 Melton, "Hey, you have seven days to apply for a
21 hearing with the Department of Revenue," correct?
22   A   He explained the revocation sheet
23 to him. And if he explained that to him, it
24 would have been in the sheet. I don't remember
25 him saying that.

Page 30

1   Q   Okay. So your recollection is
2 that he went over the sheet with him?
3   A   And he said -- I was there when
4 he refused to sign the sheet. He was not given a
5 temporary license.
6   Q   And after that, Officer Moore was
7 very clear that you're not getting a temporary
8 license, correct?
9   A   He was clear when explaining to
10 him that there was not going to be a temporary
11 license issued.
12   Q   Okay. And when you say he was
13 explaining it to him, what do you mean by that?
14   A   The revocation sheet. He was
15 going over the revocation sheet with Mr. Melton.
16   Q   All right. And when did he first
17 articulate to Mr. Melton that Mr. Melton was not
18 going to get a temporary permit?
19   A   When did he first say it?
20   Q   Yes.
21   A   At the very end of the
22 explanation of the sheet when he did not sign the
23 revocation.
24   Q   Okay. Who put Mr. Melton's copy
25 of this sheet in property?

**Page 31**

1      MR. ZIPORIN: Object to form,
2 foundation.
3      Q  (BY MR. McDERMOTT) Do you know
4 who put this sheet into property?
5      A  I don't know specifically who
6 did. Generally what happens is sheets like this
7 are placed in a box at the jail. It is a little
8 box about this big (indicating) and is put in
9 with all his property.
10     Q  Okay. And who generally does
11 that?
12     A  Generally, it's the arresting
13 officer.
14     Q  Okay. And the arresting officer
15 gives it to who at the sheriff's department?
16     A  He doesn't give it to anybody.
17 He just puts it in the box.
18     Q  He puts it in the box himself?
19     A  (Nodding head.    )
20     Q  All right. What discussion did
21 you have with Officer Moore after this arrest?
22     A  I don't really remember any
23 discussion after this arrest other than maybe
24 some of the conduct of Mr. Melton. I don't
25 remember anything specifically.

**Page 32**

1      Q  Did you talk to him at all about
2 the status of Mr. Melton's driving privilege?
3      A  No.
4      Q  Okay. What was your
5 understanding of the status of Mr. Melton's
6 driving privilege after this arrest?
7      A  He was not supposed to be
8 driving.
9      Q  Okay. And why did you believe
10 that?
11     A  Because I observed Officer Moore
12 explain the revocation sheet. He refused to sign
13 this sheet. He stated he did not have a
14 temporary license at that point.
15     Q  Okay. Why did you believe that
16 Officer Moore had the authority to not issue a
17 permit?
18     A  Because of the refusal and
19 refusing to sign.
20     Q  Okay. Who informed you that a
21 suspect's refusal to sign that form could result
22 in an officer not issuing a temporary permit?
23     A  Who informed us?
24     Q  Mm-hmm.
25     A  We've been trained on those

**Page 33**

1 revocation affidavits.
2      Q  Let's go ahead and talk about
3 that. Who has provided that training to you?
4      A  Initially, I was trained in the
5 FTO program of this department for DUIs. And
6 then we had --
7      Q  And tell -- hang on for one
8 second. I'm sorry to interrupt. Tell us what
9 you mean by FTO.
10     A  The field training officer.
11     Q  Okay.
12     A  And Officer Martin King is the
13 one that went over DUIs in the FTO program as
14 well as he did a separate training with four
15 other officers later on after I had gotten out of
16 the FTO.
17     Q  When did this training with
18 Officer King take place?
19     A  I don't remember the exact date,
20 but it was the same year I was hired, which was
21 January 14, 2001.
22     Q  Okay. How long was this
23 training?
24     A  You mean the FTO or do you mean
25 the actual --

**Page 34**

1      Q  The FTO training.
2      A  It varies from officer to
3 officer. I believe it's around 14 weeks. It can
4 go from 12 to 16.
5      Q  What all do you cover in the FTO
6 training?
7      A  There are 76 lesson plans that an
8 officer has to go through and complete a written
9 test. And then you have to pass all those lesson
10 plans before you can get out on the street.
11     Q  Tell me what an individual lesson
12 plan encompasses.
13     A  Well, there would be -- if we
14 were to go over domestic violence, then an
15 officer -- the field training officer would sit
16 with that officer and actually go over the lesson
17 plan with that officer. And depending on if
18 there is a test or not, then that officer would
19 have to pass that test. And then the field
20 training officer basically goes over procedures
21 that are handled through our department and
22 policies. They would read over policies and
23 procedures. And then they would sign off on that
24 lesson plan.
25     Q  Now, let's talk about the

Page 35

1 training with Officer King. Is it one training
2 you are referring to or a series of trainings?
3     A   Well, he was my FTO as well as he
4 trained me in SFSTs.
5     Q   And how long was your training
6 for SFST?
7     A   I think it was -- I can't
8 remember completely, but I think it was a
9 three-day course.
10    Q   Three-day course?
11    A   Yeah.
12    Q   Okay. And that was all done by
13 Officer King?
14    A   Mm-hmm, yes.
15    Q   And Officer King was employed by
16 Gunnison?
17    A   Yes.
18    Q   He was a Gunnison police officer?
19    A   Yes.
20    Q   Okay. Now, this three-day course
21 was sometime in 2001?
22    A   Yes.
23    Q   Do you recall if it was early on
24 in your career or was it a few months after you
25 had begun?

Page 36

1     A   Well, it was right after I got
2 out of FTO. And I believe I was out of the
3 program in May. And it was soon after that. I
4 can't be specific on dates.
5     Q   That's fine. I completely
6 understand. And the three-day course, is it
7 three days in a row or is it spread over a period
8 of time?
9     A   It was in a row.
10    Q   Okay. And that's where they
11 teach you how to do the standard field testing,
12 correct?
13    A   Mm-hmm, yes.
14    Q   And how many tests were you
15 trained to do in this three-day course?
16    A   How many tests?
17    Q   Mm-hmm.
18    A   We went over the roadside
19 maneuvers. Do you want those specifically?
20    Q   Sure.
21    A   Okay. He went over Romberg. He
22 went over nystagmus, the horizontal gaze
23 nystagmus; walk and turn; and the one-leg stand
24 were the sobriety tests that we went over.
25    Q   Okay. How much time was devoted

Page 37

1 to each?
2     A   I can't remember.
3     Q   Okay. Did any one of these tests
4 get more attention than the other?
5     A   Yes, actually, the horizontal
6 gaze nystagmus specifically because --
7     Q   It is a more complicated test?
8     A   Exactly.
9     Q   And it was during this three-day
10 training that Officer King instructed you on the
11 use of the expressed consent form?
12    A   He went over the revocation
13 sheet.
14    Q   Okay.
15    A   Or form.
16    Q   And tell me what he trained you
17 about with respect to that.
18    A   Well, he went over the form and
19 what was required of every officer on the top.
20 Let me see the form real quick.
21    Q   Sure.
22    A   Over the top of the form, how to
23 write your little summary on the form and then
24 where you need to mark if there is a refusal or
25 if a person has, you know, at the time, it was a

Page 38

1 .1 or more; and then whether or not you are going
2 to surrender that license; whether or not you are
3 going to give a temporary permit and have the
4 person sign the revocation, and have you sign it.
5 And then when they sign it, that acts as the
6 temporary permit within those seven days and they
7 have it until they have a hearing with the State.
8     Q   What did he tell you about
9 whether you were going to issue a temporary
10 permit or not?
11    A   If the person refuses to sign the
12 affidavit is whether or not somebody gets a
13 temporary permit or not.
14    Q   Now, that particular copy does
15 not have a back sheet. Let me show you this
16 piece of paper. Is that what is supposed to be
17 on the back side of the expressed consent form?
18    A   It looks familiar.
19    Q   Okay. Does it look like that is
20 what is on the back of the expressed consent
21 form?
22    A   On the very back?
23    Q   Mm-hmm.
24    A   Yes.
25    Q   Can you tell me whether that

**Page 39**

1  particular form indicates what it means when a
2  suspect refuses to sign the expressed consent
3  form? Go ahead and take however long you need to
4  read it.
5      A   Okay.
6          MR. ZIPORIN: Can you read that
7  back to me, please?
8          (The last question was read back.)
9      A   What I read here is it says on
10 No. 5, Refusal to sign any release or consent
11 form required by person authorized to
12 take/withdraw specimens is a refusal to take the
13 required tests.
14     Q   (BY MR. McDERMOTT) Okay. Is
15 that your understanding or is your understanding
16 different than what is on that form?
17     A   My understanding is that if they
18 refuse to sign the sheet, they've refused and
19 they don't get a temporary license.
20     Q   Okay. So is the bottom line if
21 that sheet is not signed, they are not getting a
22 temporary permit?
23     A   Yes.
24     Q   Okay. And is that how Officer
25 King trained you?

**Page 40**

1      A   Yes.
2      Q   You indicated that you've had
3  some supplemental training since that initial
4  training with Officer King with respect to
5  expressed consent and how to carry it out,
6  correct? And if I misunderstood and you are
7  talking about general DUI training, go ahead and
8  correct me. I'm not trying to confuse you.
9      A   Yeah, it wasn't specifically to
10 this, but it was in the DUI training that we
11 reviewed this.
12     Q   Okay.
13         MR. ZIPORIN: "This" being the
14 notice of revocation?
15     A   Yeah, I'm sorry.
16     Q   (BY MR. McDERMOTT) And when you
17 are talking about your supplemental training, is
18 that separate and apart from your recertification
19 on the intoxilyzer or is it all done at the same
20 time?
21     A   When we go over the intoxilyzer
22 training, this is not covered.
23     Q   Okay.
24     A   This revocation is not covered.
25     Q   Okay. So it is separate from

**Page 41**

1  that. How many times during your career have you
2  received additional training with respect to the
3  expressed consent form?
4      A   The only time I remember going
5  over the revocation sheet was recently because it
6  went from a .1 to a .08 was the changes on the
7  revocation sheet.
8      Q   Is that the only change you're
9  aware of?
10     A   The only other change I remember
11 on the revocation sheet was they just added a BAC
12 area on the sheet that we were not -- we did not
13 have on the other sheet. So it wasn't like a
14 logistic change. The only other change was this,
15 .08.
16     Q   Okay. To the best of your
17 recollection, when else have you received
18 supplemental training with respect to the
19 expressed consent form, how to execute it?
20     A   My recollection is from Martin
21 King when we went over it completely.
22     Q   Okay. The one time then?
23     A   Yes.
24     Q   Okay. And that was back in 2001?
25     A   Mm-hmm, yes.

**Page 42**

1      Q   Okay. Do you know whether it was
2  Officer King who trained Officer Moore?
3      A   Officer Moore was there with me
4  on that training.
5      Q   So you were trained together?
6      A   Yes, with two other officers.
7      Q   Did you and Moore start at the
8  same time?
9      A   Yes, we did. He was 15 days
10 ahead of me.
11     Q   I do want to come back and ask a
12 little bit more about training in a bit, but let
13 me jump back to January 2nd. After Mr. Melton
14 was not issued the temporary permit, did you have
15 any doubt in your mind as to whether he could not
16 drive after January 2nd?
17     A   No.
18     Q   I just -- we went over with Chief
19 Anderson Title 42-2-126, subpart 5(a)(I). And I
20 had underlined the part that states "an officer
21 shall issue a temporary permit."
22         MR. ZIPORIN: Just so we're
23 clear, counsel, the part that you've underlined
24 within 42-2-126, subsection 5(a), Roman I is,
25 quote, "Shall serve the notice of revocation

**Page 43**

1 personally," close quote, as opposed to "shall
2 issue a temporary permit," which is in the
3 subsequent section.
4         MR. McDERMOTT: Thank you for
5 pointing that out. I apologize. I underlined
6 the wrong "shall."
7         Q  (BY MR. McDERMOTT) Okay. I'm
8 going to read this into the record. And it's
9 actually 42-2-126, subsection (b). And it states
10 when the law enforcement officer serves the
11 notice of revocation, the officer shall take
12 possession of any driver's license issued by this
13 state or any other state, which is held by the
14 person. When the officer takes possession of a
15 valid driver's license issued by this state or
16 any other state, the officer acting on behalf of
17 the department shall issue a temporary permit,
18 which is valid for seven days after its date of
19 issuance.
20         Officer Cowan, is it fair to say that
21 your understanding of whether to issue a permit
22 or not is different than what I just read to you?
23     A   Yes.
24     Q   Okay. In your words, can you
25 explain to me how your understanding differs from

**Page 44**

1 what is in the statute?
2     A   On the revocation affidavit here,
3 it states if a person -- a peace officer and the
4 person that was arrested must sign the notice in
5 order to get a temporary permit. That's what my
6 understanding of that is. This, my
7 understanding, is what it states in the statute,
8 "shall issue a temporary permit, which is valid
9 for seven days after its date of issue."
10    Q   Would you agree with me that the
11 way the statute reads, it doesn't leave you with
12 a choice as to whether to issue the permit or
13 not?
14    A   I guess the word "shall" is kind
15 of grey, but from this and this, they contradict
16 each other.
17    Q   Okay. Let's talk about the word
18 "shall," and I do understand what you are saying.
19 Have you ever discussed that discrepancy with
20 Officer King?
21    A   No.
22    Q   Okay. Were you aware of that
23 discrepancy on January 4, 2006?
24    A   No.
25    Q   When did you first become aware

**Page 45**

1 of that discrepancy?
2     A   The criminal trial.
3     Q   The criminal trial?
4     A   Yes.
5     Q   And I take it that was when his
6 criminal lawyer had pointed out the discrepancy?
7     A   Yes.
8     Q   You obviously never -- excuse me.
9 That discrepancy was never brought to your
10 attention by the city attorney's office up here,
11 right?
12    A   No.
13    Q   And I take it from what you've
14 said prior to that criminal trial, none of the
15 other officers discussed that discrepancy; is
16 that correct?
17    A   No.
18    Q   I'm going to go ahead at this
19 time and play the audio that we were provided
20 from your stop. And I just want to go over
21 some -- ask you some questions about that, okay?
22    A   Okay.
23        MR. ZIPORIN: Now, are we going
24 to do that off the record?
25        MR. McDERMOTT: Yeah, you don't

**Page 46**

1 have to transcribe. Actually, let's keep this
2 part on the record for just a second. Eric, I
3 made an extra, do you want me to admit it as an
4 exhibit or do you care?
5         MR. ZIPORIN: I don't care. My
6 only concern was whether or not you wanted her to
7 get it into the record or not. And it is your
8 call. It is your deposition.
9         MR. McDERMOTT: I tell you what,
10 you do not have to transcribe. I will go ahead
11 and ask to mark this when we're done.
12        Do you recall what exhibit number we
13 ended with at our last deposition?
14        MR. ZIPORIN: I don't, but I can
15 make a call. Why don't we start with Cowan
16 No. 1.
17        (Audio played off the record.)
18    Q   (BY MR. McDERMOTT) Now, Officer
19 Cowan, there is a voice on there. And at the
20 outset of the call, somebody describes a driver's
21 license as being clear and valid; is that
22 correct?
23    A   Yes.
24    Q   Was that the dispatcher?
25    A   Yes.

Page 63

1 in?
2   A   Sociology with an emphasis in
3 criminal justice.
4   Q   And what was the job you had with
5 the City of Gunnison?
6   A   I worked with the parks and rec.
7 department; basically, mowing lawns and working
8 on the parks within the city limits.
9   Q   Okay. Was that full-time or
10 part-time?
11   A   It was full-time during the
12 summer, but it was a temporary position.
13   Q   And how old were you when you
14 applied?
15   A   Twenty-three.
16   Q   What made you interested in law
17 enforcement?
18   A   I've wanted to be in law
19 enforcement since I was a little kid.
20   Q   Since you were a little kid?
21   A   Yes.
22   Q   Was there any particular reason?
23   A   Well, my father was in law
24 enforcement a little while after he came back
25 from Vietnam and I just wanted to. Ever since

Page 64

1 then, I've been interested.
2   Q   Ever since then, that is what you
3 wanted to do?
4   A   Yes.
5   Q   And you have been an officer
6 since January 2001, correct?
7   A   Yes.
8   Q   And what is your current rank?
9   A   I am a patrol officer.
10   Q   Are there different ranks amongst
11 patrol officers or not?
12   A   Not really. There is seniority.
13 And that's from the hire date -- or not the hire
14 date, from the date you start. And then that's
15 it, just seniority.
16   Q   At this point, where are you in
17 terms of seniority?
18   A   I'm the highest on seniority.
19   Q   The highest out of the patrol
20 officers?
21   A   Yes.
22   Q   Okay. Do you plan on continuing
23 on patrol?
24   A   Yes. And, obviously, if there
25 are promotions in the future, then I would apply

Page 65

1 for those as well.
2   Q   With respect to DUI training, I
3 just have a few questions. I'm just going to
4 show you what has been given to me as
5 Melton/Gunnison 594 to 595. It is just labeled
6 "Work Goals and Objectives Development Form DUI."
7 Can you tell me what that is?
8   A   This is the class for the
9 intoxilyzer that I took, the very first one.
10   Q   Okay. Do they give you that
11 piece of paper or is that just an outline of the
12 course? Tell me what it is and if it is
13 significant at all.
14   A   I don't remember having this
15 piece of paper when I attended the class.
16   Q   Okay. What written materials
17 have you been given for DUI training?
18   A   You mean during the trainings,
19 what were we provided?
20   Q   Mm-hmm.
21   A   Well, I can't remember
22 specifically, but when we go over things, we
23 would be going over the notice of revocation.
24 They'd obviously have a sheet for us to review,
25 the summonses, citations, how to fill those out.

Page 66

1 We were given a little sheet of paper that you
2 can carry in your pocket for when you are doing
3 the roadside maneuvers just to keep notes. Those
4 are all the ones I can remember.
5   Q   Okay. Are you issued any
6 materials from the Department of Revenue?
7   A   No.
8   Q   Are you issued any sort of book
9 with medical knowledge and how it relates to
10 nystagmus testing?
11   A   That's a possibility.
12   Q   Okay. You are not sure on that,
13 though?
14   A   No.
15   Q   You don't recall a specific
16 publication being given?
17   A   I don't.
18   Q   What outside training -- and when
19 I say, "outside," I mean people from other
20 departments or other agencies -- have you
21 received with respect to DUI detection?
22   A   Well, obviously, here it was held
23 in Crested Butte, intoxilyzer training. And I
24 also had to attend an SFST course with Warren
25 Brown in Montrose.

Multi-Page™

Page 67

1  Q  So Warren Brown of the Montrose
2  department has provided training?
3  A  He provided training to me in
4  June of last year.
5  Q  June of?
6  A  2006.
7  Q  Who else outside of the
8  department has provided training for you?
9  A  For DUI?
10  Q  Actually, let me clarify. You
11  said Crested Butte. Who taught that? Who was
12  responsible for that training seminar?
13  A  You know, I can't remember if it
14  was just held in Crested Butte. Obviously, I can
15  read this and tell you who was teaching it, but
16  it was in Crested Butte is all I remember.
17  Q  Have you applied for any
18  department jobs other than patrol?
19  A  Yes. I've applied to a
20  supervisor position.
21  Q  What kind of supervisor position?
22  A  It would be a patrol sergeant.
23  Q  When was that that you applied
24  for that?
25  A  It was in April of -- yeah, April

Page 68

1  of 2006.
2  Q  Who is the patrol sergeant now?
3  A  When I applied, who got the
4  position?
5  Q  Yeah.
6  A  Ron Moore.
7  Q  Ron Moore did?
8  A  Yes.
9  Q  Who is currently the patrol
10  sergeant supervisor at the time Moore left?
11  A  There are two of them. And,
12  actually, that position has not been refilled.
13  There is Sergeant Jim Powers and Sergeant Chris
14  Wilson.
15  Q  And this position is currently
16  open then?
17  A  Yes, it is.
18  Q  Are you applying for it?
19  A  When it opens up, I will.
20  Q  I am going to hand you what I
21  have that's been marked Melton/Gunnison 599. Do
22  you know what that is, Officer Cowan?
23  A  You know, I don't. The only
24  thing I can tell you is there are case numbers on
25  the left. And on all of these cases, I was the

Page 69

1  investigator or the investigating officer on
2  these complaint numbers.
3  Q  Okay.
4  A  Incident numbers.
5  Q  Okay. So what does that mean?
6  Those are just cases you were working on?
7  A  Yeah, that's what I would think
8  they are. When we do a query in ITI, you can put
9  in your DSN number and you have cases that you
10  have to follow up on. That's what this looks
11  like.
12  Q  That's what it looks like to you?
13  A  I don't know what it is.
14  Q  All right. Fair enough. Who
15  would know what it is?
16  A  Captain Robinson. I would ask
17  him.
18  Q  When did you first become
19  certified on the intoxilyzer?
20  A  When I took that class in Crested
21  Butte. I don't know the dates unless it is on
22  this.
23  Q  Go ahead and take a look.
24  A  It says April 16th, so that
25  probably means it was in 2002 because I didn't

Page 70

1  take an intoxilyzer class when I was in FTO. And
2  I was in FTO in April of 2001.
3  Q  So you're estimating -- give me
4  an estimate of when you believe you were first
5  certified on the intoxilyzer.
6  A  I guess that would be a little
7  bit over a year from my hire date.
8  Q  So sometime in 2002?
9  A  Mm-hmm, yes.
10  Q  Prior to that time, what would
11  you do on DUI calls? Would somebody else just --
12  A  Yes, if I wasn't certified, then
13  you would call an officer over to that location
14  that was certified.
15  Q  Okay. During that first year,
16  were you certified on the field sobriety tests?
17  A  Yes.
18  Q  You were?
19  A  Yes.
20  Q  Just not the intoxilyzer?
21  A  Yes.
22  Q  Okay. Since you were certified
23  on the intoxilyzer, have you remained current
24  with that certification?
25  A  With the intoxilyzer, yes.