**EXHIBIT 4**



# MINITRANSCRIPT

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CIVIL ACTION NO. 07-CV-00029-RPM-PAC**

**DEPOSITION OF: GREG ANDERSON
EXAMINATION DATE: October 9, 2007**

**BUCK MALOY MELTON,**

Plaintiff,

v.

**CITY OF GUNNISON, COLORADO; OFFICER RONALD
MOORE, Individually; and OFFICER GRACE COWAN,
Individually,**

Defendants.

## APPEARANCES

SEAN M. McDERMOTT, ESQ.
ERIC ZIPORIN, ESQ.

Multi-Page™

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CIVIL ACTION NO. 07-CV-00029-RPM-PAC

---

DEPOSITION OF:  GREG ANDERSON
EXAMINATION DATE:   October 9, 2007

---

BUCK MALOY MELTON,

Plaintiff,

v.

CITY OF GUNNISON, COLORADO; OFFICER RONALD MOORE,
Individually; and OFFICER GRACE COWAN,
Individually,

Defendants.

---

     PURSUANT TO NOTICE, the deposition of GREG ANDERSON was taken at 8:38 a.m. on October 9, 2007, at 201 W. Virginia Avenue, Gunnison, Colorado, before Lisa Persichitte Reed, Certified Realtime Reporter and Notary Public in and for the State of Colorado, said deposition being taken pursuant to the Federal Rules of Civil Procedure.


           Lisa Persichitte Reed
       Certified Realtime Reporter

Attorneys Service Center
(303) 295-DEPO

Page 11

1     A  Yes.
2     Q  Do you know why he left?
3     A  He retired.
4     Q  Did you have a transition plan
5 with that chief? Let me ask that better. How
6 did you end up walking into the job? What did he
7 do to transition you into it?
8     A  Well, I applied for the position
9 in June of August (sic) -- let me back up.
10 Actually, I applied for the position maybe, like,
11 in April of 2005. And then we went through a
12 series of filling out different forms and talking
13 over the phone. I actually came out here a
14 couple different times prior to June of 2005 when
15 I was actually hired by them, when I did get an
16 opportunity to meet the chief. However, I did
17 not actually come here to work until August of
18 2005.
19     But in the interim time, once they told
20 me yes, you are going to be the police chief in
21 June 2005, Captain Robinson, who is still
22 currently here, Captain Keith Robinson is still
23 here. He was Keehne's No. 2 guy. We began a
24 series of conversations, talking over the phone.
25 He e-mailed me regularly on as far as what events

Page 12

1 were going on within the police department. And
2 that's kind of how we did it.
3     So, actually, when I came here, Chief
4 Keehne was already gone. He had been gone for
5 two months.
6     Q  Okay. What are your duties as
7 the chief?
8     A  Well, as the police chief, my
9 main responsibility is to look long term for the
10 police department. I have a responsibility to
11 make sure that the goals and objectives of the
12 police department are carried out in a functional
13 manner. And then I have a responsibility to work
14 with the other administrators to make sure that
15 they are doing their jobs as well.
16     Again, as a police chief, I'm not
17 responsible for overseeing every single function
18 of the police department, but it is my
19 responsibility to make sure those other functions
20 are carried out in an appropriate manner.
21     Q  Are you ultimately in charge of
22 hiring and firing?
23     A  Ultimately?
24     Q  Yes.
25     A  Any time -- well, here in the

Page 13

1 city of Gunnison, we don't have an HR, a human
2 resources director. What we have is a personnel
3 director, and that is the city manager.
4     So working in conjunction with him, we
5 decide, you know, whether or not we're going to
6 hire somebody, whatever the case might be, or
7 fire somebody. It has to be done with his
8 approval.
9     Q  Who is the city manager?
10     A  Ken Coleman.
11     Q  Do you know how long he has been
12 the city manager for?
13     A  Ken has been in the position now
14 for approximately, I want to say, maybe a year
15 and a half, but he has been -- let me back up.
16 That is how long he has been in the position, but
17 he has been with the city, I want to say, over 25
18 years.
19     Q  Do you know who the city manager
20 was prior to Mr. Coleman?
21     A  Yes, Mark Collins.
22     Q  Cowans (sic)?
23     A  Collins, C-o-l-l-i-n-s.
24     Q  And do you know when Mr. Collins
25 was the city manager?

Page 14

1     A  Oh, up to, like, a year and a
2 half ago, but -- and I think he was -- I'm not
3 sure how many years he was here. He was here
4 quite a few years.
5     Q  Okay. Was he here when Officer
6 Moore was hired?
7     A  I don't know. I don't want to
8 say because I don't know.
9     Q  Do you know if he was here when
10 Officer Cowan was hired?
11     THE DEPONENT: Weren't you hired
12 at the same time as --
13     MR. ZIPORIN: You've got to just
14 answer.
15     A  Oh, I don't know.
16     Q  (BY MR. McDERMOTT) With respect
17 to training officers, whose responsibility is
18 that to train?
19     A  As far as -- again, this is a
20 small jurisdiction. We have 15 total sworn
21 officers. So really, what it boils down to is I
22 work with Captain Robinson who oversees -- we
23 have several trainers that actually are in charge
24 of training, but Captain Robinson actually
25 oversees all of that. He makes sure that all the

Page 15

1 records are there. He makes sure that everything
2 is documented appropriately.
3     Q   Okay.
4     A   And then we meet as a command
5 staff. And that would be all the supervisors.
6 We meet together and talk about various issues.
7 Again, we do have, as I mentioned before,
8 Colorado POST -- or the State of Colorado, let me
9 back up, says that we have to maintain 40 hours
10 of training every year. So we all work that out
11 together in that command staff.
12    Q   Tell me what you mean when you
13 refer to "Colorado POST."
14    A   It's an entity. It is a State of
15 Colorado entity. POST is made up of --
16 basically, it's subject matter experts. And they
17 work -- well, actually, they don't work for the
18 State of Colorado. They serve at the leisure of
19 the governor. And they are on a -- it's kind of
20 like an oversight board, if you will, for
21 training. And they, kind of, dole out the monies
22 to each specific region. And then that region
23 has someone who is in charge of making sure that
24 the region spends the money appropriately and
25 responsibly for the purpose of training.

Page 16

1     Q   Okay. Can you tell me specific
2 areas that officers are given specific training
3 for? For instance, motor vehicle, officer
4 awareness --
5     A   Well, I mean, obviously, there
6 are many areas. When they go into the police
7 academy, they are trained in various areas. And,
8 obviously, some of those are officer safety
9 areas. They get defensive tactics. They learn
10 how to do proper building searches, as well as,
11 like I talked about, vehicle stops. They do all
12 those types of things. They learn traffic law,
13 criminal law, all those topics are covered in the
14 academy.
15    Q   In the academy?
16    A   Sure. As well as then there are
17 updated -- we actually have the responsibility to
18 keep that training up-to-date. Again, that 40
19 hours a year, that is where they expect you to,
20 kind of, keep up on all those areas. And,
21 obviously, there are certain areas that are more
22 important than others.
23    Q   And is the 40 hours a year just
24 general law enforcement --
25    A   Topics, yes, sir.

Page 17

1     Q   Across the board?
2     A   Yes.
3     Q   Okay.
4     A   Now, within those 40 hours, I
5 will point out, there are certain requirements
6 that still need to be met. As an example, the
7 intoxilyzer machine, you have to be recertified
8 in that every six months. As an example, field
9 sobriety tests, you have to be recertified on
10 that every two years. You have to have two hours
11 of training every two years to keep you
12 up-to-date on those. That's just an example.
13    Q   Actually, I was going to ask you
14 about the intoxilyzer retraining. That is once
15 every six months?
16    A   Intox, yes, sir.
17    Q   Okay. Now, the training that's
18 done with respect to the intoxilyzer, that, I
19 take it, is in addition to the 40 hours. It's
20 not included in that 40 hours?
21    A   It can be included in that.
22    Q   It can be included in that?
23    A   Yes, sir. It is a culmination of
24 everything.
25    Q   Okay. How many hours of training

Page 18

1 in a year does it take to keep your intoxilyzer
2 recertification up-to-date?
3     A   Every six months, you have to go
4 through this course. I'm not sure how long the
5 course is, but you have to be recertified every
6 six months.
7     Q   Okay. I understand that. But
8 you don't know how long the course is?
9     A   How long, no, I do not.
10    Q   So you don't know how much of
11 that 40 hours is encompassed or is taken up by
12 the intoxilyzer recertification?
13    A   No, I do not.
14    Q   Okay. How does the intoxilyzer
15 recertification play out? Is it the individual
16 officer's responsibility to keep it up-to-date or
17 is somebody in a supervisory role reminding them
18 and telling them to do it?
19    A   Well, I would like to think it is
20 both ways. I think I have -- I ask that the
21 officers be responsible for making sure that they
22 stay up on all their qualifications.
23        Additionally, we do have -- again, we
24 have Captain Robinson who, kind of, fulfills the
25 administrative role of that. And he, kind of,

Multi-Page™

**Page 23**

1 are rookies.
2     Q   And outside of them --
3     A   Yes.
4     Q   -- is everyone else current?
5     A   Yes.
6     Q   Do you know what your patrol
7 officers are retrained on with respect to motor
8 vehicle law in addition to the two areas we just
9 covered?
10    A   Do I know what they are trained
11 in?
12    Q   Yeah.
13    A   No.
14        MR. ZIPORIN: He said,
15 "retrained."
16    A   Oh, retrained in, no, I do not.
17    Q   (BY MR. McDERMOTT) Is there
18 anyone who comes in and keeps your officers
19 current with Colorado motor vehicle law?
20        MR. ZIPORIN: I'll object to the
21 form of the question.
22    A   You are asking if there is
23 someone that comes in to educate them on Colorado
24 law?
25    Q   (BY MR. McDERMOTT) Yes.

**Page 24**

1     A   Yes, we do have -- we have a
2 district attorney that does a periodic update of
3 Colorado law updates.
4     Q   Okay. And is that the district
5 attorney or one of his deputies?
6     A   One of his deputies comes up to
7 do that.
8     Q   Is there a specific deputy who
9 does that or does it vary?
10    A   No, it doesn't. It just depends
11 upon who he has available. They try to make it
12 one of the folks that are here on a permanent
13 basis.
14    Q   Okay. Do you or does anyone
15 within the department speak to individual
16 officers about Title 42 statutes, motor vehicle
17 statutes?
18    A   Yes, in the sense that I expect
19 my patrol sergeants to be supervising the
20 officers. And if there is a problem with
21 something that an officer may or may not do
22 regarding Title 42, then, obviously, I would
23 expect him to address that issue.
24    Q   With respect to Fourth Amendment
25 law, who provides training to your officers with

**Page 25**

1 respect to Fourth Amendment search and seizure
2 law?
3     A   That would be the district
4 attorney's office.
5     Q   And how is it decided that the
6 district attorney's office would provide training
7 with respect to Colorado law and Fourth Amendment
8 law?
9     A   You know, out of the years I've
10 been in law enforcement, that's just been the way
11 it's been in every jurisdiction I've been in.
12 And so I really didn't question it when I came
13 here. That's just how it has always been done
14 here. That is not a good reason, but that's just
15 how it has been done in law enforcement that I'm
16 aware of.
17    Q   And that's the way it was done
18 here when you stepped into this job?
19    A   Yes, sir. Yes, that's correct.
20    Q   And let me ask it this way: Does
21 anyone from the district attorney's office
22 interact with your department and decide what
23 will or will not be taught to your officers?
24    A   They indeed do contact me and ask
25 me, "Are there any specific trouble or problem

**Page 26**

1 areas we need to cover?" Yes, they do ask that.
2     Q   Okay. And they speak with you
3 specifically with respect to that?
4     A   Either myself or Captain
5 Robinson.
6     Q   It's been just a little over two
7 years since you've been chief, have you
8 identified any problem areas that you have
9 requested the district attorney to provide
10 specific training on?
11    A   I think the last time that he
12 conducted training, I think one of the areas that
13 I requested him to focus on was search incident
14 to arrest. I don't think that was driven by any
15 particular issue that I was aware of, but it's
16 just one of those issues that in law enforcement,
17 it seems like the guys that work the road need to
18 be reminded what that looks like, what it
19 properly should look like. That's an area I like
20 them to spend time on.
21    Q   When did you talk to the district
22 attorney's office with respect to that particular
23 issue?
24    A   I don't recall the specific time.
25 It was sometime last year.

Page 31

1 department?
2    A   No, I couldn't specifically tell
3 you.
4    Q   Okay. Who trains your officers
5 on how to use the form and what they are supposed
6 to do when there is a refusal or a high breath
7 test?
8    A   The officer that does that
9 training is the officer that does the field
10 sobriety testing training, if you will. As well
11 as, I should also point out, their FTO, when they
12 are in training, also reiterates that same area.
13    Q   And just so we're clear when we
14 have it in one place in the transcript, which
15 officer is that again? Who provides that
16 training?
17        MR. ZIPORIN: Field training
18 or --
19    A   Yeah.
20    Q   (BY MR. McDERMOTT) You said it
21 was the same officer --
22    A   Oh, the one that does the initial
23 field sobriety testing training, in this case
24 most recently -- well, let me back up. There are
25 two different things we're talking about here.

Page 32

1 When you do a recertification in field sobriety
2 testing, that is a little bit different emphasis
3 than when someone is going through the whole
4 field sobriety testing training for the very
5 first time. They spend more time on the
6 administrative function than they would when
7 someone is just doing a recert. In other words,
8 just being kept up to speed of changes.
9        So as an example, Sergeant Warren Brown
10 with the Montrose Police Department did our
11 update training. And he also recertified one of
12 our officers when they lapsed while they were on
13 leave. He also totally recertified them from the
14 ground all the way up in that same field. Does
15 that help?
16    Q   Yeah, I'll follow it up. When
17 the form changed -- or let me back up.
18        Do you recall the last time the form
19 was changed by the Department of Revenue?
20    A   No, I do not.
21    Q   Was there any specific training
22 given to the officers after that form was
23 changed?
24    A   That, I don't recall. I don't
25 know.

Page 33

1    Q   If there was -- let me ask it:
2 Who would have knowledge as to whether there was
3 training conducted with your officers after that
4 form was changed?
5    A   One or two people would or both.
6 Captain Robinson may. Also, Sergeant Warren
7 Brown, when I told you that he does -- well, he
8 did our most recent refresher training. Changes,
9 those are things he brings us up to speed on.
10 That is something he would cover.
11    Q   Do you have lawyers review the
12 Department of Motor Vehicle forms?
13    A   Normally, no.
14    Q   Okay. And you qualified that
15 with "normally, no." Tell me --
16    A   Well, when this lawsuit was
17 filed, obviously, I sent all the information to
18 our attorney with the form.
19    Q   Okay. And I don't want to get
20 into specific discussions with your attorney, but
21 when you say your attorney, are you referring to
22 Mr. Ziporin and his firm?
23    A   Yes, I am.
24    Q   To your knowledge, prior to this
25 lawsuit, did anyone from the city attorney's

Page 34

1 office ever sit down and look at the form that
2 was issued by the Department of Revenue?
3    A   That, I do not know.
4    Q   Can I have just a minute to get
5 one of the forms?
6        MR. ZIPORIN: Do you need a
7 break?
8        THE DEPONENT: I'm good.
9        MR. McDERMOTT: Eric, I'm just --
10 I didn't copy this for you guys because we had an
11 agreement that we had the same stuff in the
12 underlying criminal case, but this is just the
13 expressed consent form.
14        MR. ZIPORIN: Okay.
15    Q   (BY MR. McDERMOTT) Chief, go
16 ahead and take a look at that expressed consent
17 form.
18    A   Okay.
19    Q   Is that the same form that your
20 department currently uses, the same format?
21    A   I'm not 100 percent sure of that.
22 I would have to look and see which form we're
23 using as of this moment. No, I don't know that.
24    Q   And you don't recall when that
25 particular form was issued. Is that fair to say?

Page 35

1  A  This particular one, no, I don't.
2  Q  And when I say, "issued," I mean
3  when the Department of Revenue gave it to you
4  guys and instructed you to use that?
5  A  I don't know when that was.
6  Q  Okay. When they send you new
7  forms, what instructions do they give you with
8  respect to it?
9  A  They basically say to discard the
10 old forms and use the new forms. That is what
11 they tell you.
12 Q  And that's it?
13 A  It depends. If there is a
14 pertinent change that requires more discussion,
15 usually, they will actually have -- the person
16 that does the specific area of training that is
17 affected by it will come out and do some type
18 of -- maybe it's a paragraph of training or maybe
19 it's just a short discussion, but they will
20 usually do some type of training to make sure
21 that whatever the change is that they are
22 instituting, that it's been covered by them so
23 you know why you are doing something differently
24 when you've done something in the past.
25 Q  And who provides that training?

Page 36

1  Is it someone from the Department of Revenue or
2  do they leave it up to you guys to train on that?
3  A  Again, it just depends what it
4  is. If it's just, you know, instead they want a
5  middle name versus the middle initial, you know,
6  the full middle name, then that is just something
7  they would send us by e-mail or send by mail and
8  say, "Please note the change on this form and
9  make sure you annotate this appropriately."
10 Q  Okay. Since you've been the
11 chief here, has the Department of Revenue or the
12 Department of Transportation ever sent someone
13 out here to provide specific training?
14 A  Not that I'm aware of, no.
15 Q  Okay. Can you tell me what your
16 understanding is of what your officers are
17 supposed to do in the event somebody they pull
18 over either refuses testing or has a high breath
19 test? What are they supposed to do with respect
20 to that form in that particular case?
21 A  If they pull somebody over and
22 the individual refuses to either participate or
23 cooperate in the testing or they refuse to
24 provide blood, saliva, urine, breath, one of
25 those things, then they have to follow this

Page 37

1  protocol, which clearly states that their
2  driver's license -- their driving privilege would
3  be revoked and that they are to follow the form
4  verbatim right down the line to the point where
5  it talks about you need to make sure that you
6  communicate to them that you have the right to
7  request a hearing under 42-2-126; and that yes,
8  it is possible they may be granted a temporary
9  permit, which would be good up to the first
10 hearing date. And, again, it is reiterated.
11    And when you talk about surrendering
12 their driver's license, if they surrender their
13 driver's license, then the officer may issue a
14 temporary permit for their use, which would be
15 good for seven calendar days after the date of
16 the notice.
17    And lastly, if they -- if the offender,
18 the driver, whatever, if he -- there has to be
19 two things for the temporary permit to be valid
20 according to the paragraph as I read it and have
21 read it; that they have to make sure that they,
22 as the driver or the person that's been stopped,
23 that they sign it. And the peace officer also
24 has to sign that document to make sure their
25 temporary permit is valid.

Page 38

1  Q  Okay. And you used the word
2  "may" issue a temporary permit. Is that your
3  understanding from the form or is there any other
4  basis for that understanding?
5  A  Well, it is actually from two
6  places. One is the form from the Department of
7  Revenue, Form DR-2576. And also, I will tell you
8  that that's the protocol that is followed. And
9  after the lawsuit was filed, I immediately
10 checked with our instructor in this, Sergeant
11 Warren Brown, verified what the protocol was. I
12 also checked with Lakewood Police Department to
13 verify what their protocol was.
14 Q  And tell me, what did Sergeant
15 Brown tell you?
16 A  Sergeant Brown stated that their
17 protocol was as stated right here on the DR-2576,
18 that the officer may issue a temporary permit
19 given these other requirements.
20 Q  Did Sergeant Brown indicate when
21 it was okay not to issue a temporary permit?
22 A  Yes, he did. When a subject
23 wouldn't sign the temporary permit, he wouldn't
24 get the temporary permit because it would be in
25 violation of the form.

Page 47

1 sheriff's department?
2   A   That is correct, the Gunnison
3 County Sheriff's Office.
4   Q   So you don't know what they do.
5 It would be up to them if they want to go over it
6 with them again or not. They would be in charge
7 of giving him his property?
8   A   That would be correct, yes.
9   Q   Chief, you would agree with me
10 that the statute says that the officer shall
11 issue a permit?
12   A   If you are talking specifically
13 about what it says right here in the Title 42 of
14 the Colorado Revised Statutes, what the wording
15 here is in the book, I will agree that it does
16 say, "shall serve" -- or wait, yes, it does say
17 that the officer acting on behalf of the
18 department shall issue a temporary permit, which
19 is valid for seven days after its date of
20 issuance.
21   Q   Do you know why there is a
22 discrepancy between the statute and the form
23 that's issued by the Department of Revenue?
24   A   No, I do not know why.
25   Q   I take it the department has

Page 48

1 never offered any explanation for that?
2   A   Are you referring to the
3 Department of Revenue?
4   Q   Yes, Department of Revenue,
5 excuse me, yes.
6   A   No, I've never heard a reason for
7 that.
8   Q   Okay. And from what you've said,
9 it sounds like you don't know specifically of
10 your city attorney's office having any discussion
11 with the Department of Revenue with respect to
12 that discrepancy?
13   A   Not that I'm aware of.
14   Q   Okay. Prior to the -- before I
15 ask this question, I'm really not trying to be a
16 smart aleck, so if it comes out the wrong way, I
17 apologize. Prior to the issuance of this
18 lawsuit, did you know that there was a
19 discrepancy between the statute and the form with
20 respect to the words "shall" and "may"?
21   A   No, I did not.
22   Q   Since this lawsuit, have you
23 discussed that discrepancy with Sergeant Brown?
24   A   Yes, I have.
25   Q   What has Sergeant Brown said with

Page 49

1 respect to the discrepancy?
2   A   The State of Colorado --
3 throughout the state of Colorado, law enforcement
4 agencies rely upon the DR Form 2576 to provide
5 guidance. And that's the form they follow.
6   Q   Does your department keep track
7 of drivers that an officer -- excuse me.
8       Does your department keep track of
9 permits that the arresting officer refuses to
10 issue?
11   A   Only in the sense that we keep
12 arrests -- we keep all our arrest reports, police
13 reports on file. Would I be able to retrieve and
14 see how many times a particular officer has had
15 somebody refuse, I could calculate that.
16   Q   Okay. You would need to go back
17 and look at that, though. It is not something
18 that a separate statistic is kept on, if I'm
19 understanding correct?
20   A   That is correct. We don't keep
21 statistics. I could calculate that. We have all
22 the arrest reports and we could go through it if
23 necessary.
24   Q   Okay. When you -- let me ask it
25 this way: Have you discussed with any other

Page 50

1 police departments the discrepancy between the
2 statute and the form?
3   A   Yes, I have.
4   Q   Okay. And which departments were
5 those?
6   A   Montrose and Lakewood.
7   Q   Okay. And were those in the same
8 conversation that you already -- the same
9 conversation that you talked about?
10   A   I think so, yes, that is correct.
11   Q   What was the explanation that
12 Lakewood gave you of the discrepancy?
13   A   The DR Form 2576 is the form that
14 we follow in the state of Colorado. That is the
15 form that was put out by the State of Colorado
16 and the Department of Revenue.
17   Q   Okay. Is it your understanding
18 that if someone refuses a chemical test, they can
19 or cannot be issued the permit, the temporary
20 permit?
21   A   If you're asking if they refuse
22 to take the breath, urine, blood, saliva tests,
23 is it my understanding they could still be issued
24 a temporary permit?
25   Q   Yes.