**EXHIBIT 5**

1

**BRUNO
REPORTING
COMPANY**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-CV-00029-RPM

Plaintiff:

BUCK MALOY MELTON,

v.

CITY OF GUNNISON, COLORADO; OFFICER RONALD MOORE, individually, and OFFICER GRACE COWAN, individually.

Defendants:

---

DEPOSITION OF GARY F. PIROSKO, ESQ.

December 17, 2007

---

APPEARANCES

FOR THE PLAINTIFF:   SEAN McDERMOTT, ESQ.
                     McDermott Hansen & McLaughlin, LLP
                     1890 Gaylord Street
                     Denver, Colorado  80206

FOR THE DEFENDANTS:  ELLIOTT J. SCOTT, ESQ.
                     Senter Goldfarb & Rice, LLC
                     1700 Broadway, Suite 1700
                     Denver, Colorado  80290



*899 Logan St.
Suite 208
Denver, CO
80203
303 / 831-1667
Fax / 831-4432*

CLAUDIA R. BOOTON, RPR
BRUNO REPORTING COMPANY, INC.
(303) 831-1667

Page 18

1 then.
2    A   I learned how to -- I'll take one example
3 of something that happened. The officers that were
4 involved in the DUI arrest here had to make a
5 determination about probable cause and things like that.
6 You have to actually sometimes be on the scene to be able
7 to -- or have been through the process. It's tough for
8 me to explain to a citizen, Look, this is what's going on
9 on the street, this is what the officer has to do, this
10 is what he or she has to look for.
11         And in a situation where this officer
12 makes a determination that there's a refusal, but there
13 is an indication in just the arrestee's physical demeanor
14 and statements and everything like that where the officer
15 is sitting there thinking, what's this -- I mean, am I
16 guesstimating what this blood alcohol is going to be.
17         I say this because I think this officer
18 violated this person's rights, and this officer failed to
19 properly preserve evidence, because there is, I believe,
20 a recantation of the refusal in this case.
21         Having been involved in so many DUI
22 arrests, not only my own, but I also was backup on other
23 officers' arrests, I've seen multiple videos of DUI
24 arrests. Sometimes officers would rather get a refusal
25 than an actual test result because some officers just

Page 19

1 have an attitude, this person is going to go to jail.
2 I'm going to give him as hard a time as possible. And I
3 know a refusal will cause this person probably more
4 hardship than a valid test result.
5         So I've been there hundreds of times.
6 That's part of what I can base my opinion on from '81 to
7 '89, seeing how this process worked with hands-on
8 experience as opposed to just theory.
9    Q   Tell me about times from 1981 to '89 where
10 someone recanted their refusal. What did that look like?
11    A   You mean a specific case?
12    Q   If you can remember one.
13    A   I can't remember one.
14    Q   Okay.
15    A   And I don't know -- I would have to look
16 back to see what the case law was or the statutory law
17 was back there, to see if a recantation was even
18 possible. I don't know.
19    Q   Do you remember what the generally
20 accepted police policy and procedure was for handling
21 refusals during the period of 1981 to 1989, or did you
22 ever know?
23    A   I'm not exactly sure what you mean by
24 that. That's pretty vague, what the policy was.
25    Q   What was the generally accepted police

Page 20

1 practice and procedure -- let me ask you this: Did you
2 at one time know what the generally accepted police,
3 practice, and procedure was for handling refusals under
4 the DUI statute from 1981 to 1989?
5    A   I'm going to have to ask you to narrow
6 that down. Are you talking from DMV's perspective
7 as -- from all law enforcement agencies across Colorado,
8 from my agency, from the Gunnison Police Department's
9 agencies, from State Patrol's point of view? I'm not
10 exactly sure what you mean.
11    Q   I'm looking for what was generally
12 accepted.
13    A   I'll make a statement, and can you ask me
14 if -- my position is --
15         MR. McDERMOTT: Object to the form of the
16 question.
17    A   -- is and always has been, if a person had
18 a valid driver's license and they refused to take a test,
19 they got a temporary permit, period. That has always
20 been my impression, and that's my opinion. It's never
21 changed.
22    Q   (BY MR. SCOTT) That was true from 1981 to
23 1989?
24    A   Yes, as long as the expressed consent form
25 has been around.

Page 21

1    Q   And do you know how long it's been around?
2    A   In present form, no, because I don't know
3 when they -- they may have changed a word or sentence
4 structure. They obviously have changed blood alcohol
5 levels stuff on that, but --
6    Q   I might have asked you this already, but
7 the last time you had a DUI arrest was in 1989?
8    A   I feel fairly confident that's true, and I
9 think my last month was probably January of '89.
10    Q   You said that -- I guess, this is back
11 when you were in the DA's office -- maybe that's not
12 true. But when were you first qualified as an expert
13 witness about DUI cases?
14    A   Sometime when I was a police officer, and
15 I wouldn't know when -- sometime during those eight
16 years. And I don't know how many times. It would have
17 always been in Arapahoe County Courts.
18    Q   What was the subject matter on which you
19 were an expert witness?
20    A   The detection, apprehension, and
21 processing of DUIs and probably standardized field
22 sobriety testing, SFSTs.
23    Q   Would that include expertise in the
24 process for handling an arrested person after the
25 arrest -- that was a terrible question.

Page 30

1  And so I guess that would be at least one that of the
2  List Serve things I was relying on.
3      Q   Let's see. What other responses did you
4  get to your request on the List Serve that you referenced
5  a minute ago?
6      A   These were the only documents that I got.
7      Q   Any other responses that didn't include
8  documents?
9      A   To that question?
10     Q   Yeah.
11     A   No.
12     Q   Are there any other portions of the List
13 Serve or postings on the List Serve that you're using as
14 a part of the basis of your expertise today?
15     A   No, but I did make a phone call before
16 coming here today. I called a person who is a former DMV
17 hearing officer. Her name is Patricia Hutton,
18 H-U-T-T-O-N. She probably was a hearing officer, I
19 think, for 25 years or so. She went to law school. She
20 finally left the Department of Revenue, I'm guessing,
21 within the last six months, and she's presently a private
22 attorney. So I called her today to get an answer to a
23 question that I had.
24     Q   What question was that?
25     A   The bottom line is, there is an issue

Page 31

1  about whether or not the second officer on -- the officer
2  on January 4 should have made that stop and what she was
3  making an assumption on. And my question had to do with
4  since the original officer on the DUI case didn't issue
5  the notice of revocation, the temporary permit, should
6  the second officer -- or should the officer on the 4th
7  have made the assumption that there was no valid driver's
8  license. Because it was my belief, and Patricia Hutton
9  confirmed this, that Mr. Melton could have gone down to
10 the Department of Revenue on January 3 and actually
11 gotten a valid driver's license. He had a valid driver's
12 license, but they would have issued him a temporary.
13         And I just confirmed that. I said, Patty,
14 I want to run a scenario by you -- and I'm paraphrasing
15 the conversation. A person gets arrested, the officer
16 doesn't issue the notice of revocation, and that's on a
17 business day, and there's an intervening business day.
18 And then on the next business day, an officer assumes
19 that the driver doesn't have a driver's license because
20 she believes that a temporary wasn't issued. Could the
21 person have gone down on that intervening day and been
22 issued a valid temporary? And she says, Absolutely.
23         And so the officer on the 4th, I think,
24 was jumping the gun on that assumption.
25     Q   So you're saying that the officer should

Page 32

1  have assumed that Mr. Melton had gone to the Department?
2      A   No. What I'm saying is, she shouldn't
3  have assumed that he didn't have a valid driver's
4  license. I think she violated his rights by making that
5  assumption and stopping him.
6      Q   So that's a legal opinion about whether or
7  not there was reasonable suspicion at the time she pulled
8  him over?
9      A   It's a legal opinion. But it's also I'm
10 basing it on my experience as a police officer in the
11 last 28 years of experience in this field, of knowing
12 that she should have found out before she made the stop.
13 And she certainly shouldn't have assumed that he didn't,
14 because I believe in her deposition transcript, the
15 dispatcher originally said that he was valid. And I
16 believe that to be a true statement, in that he was valid
17 for a couple of different reasons.
18         I think that that officer on the 4th -- is
19 it Cowan -- yeah, Officer Cowan -- should not have made
20 the stop because -- it's not that she should have assumed
21 that he did go down there; she shouldn't have assumed
22 that he didn't go down there.
23     Q   How does that fit into the reasonable
24 suspicion analysis?
25     A   If I recall, she stopped him just because

Page 33

1  she believed he didn't have a valid driver's license.
2  You can't use your position as a law enforcement with
3  stop and arrest powers and use those based upon an
4  assumption which could be wrong. She didn't observe any
5  violations of law. She decided to use her law
6  enforcement powers based on an assumption that may have
7  been wrong. She can't just guess at that stuff; and
8  that's what she was doing.
9      Q   Okay. Let's go for a minute to these --
10 what's been marked as Exhibit 7. So what is the
11 importance of these expressed consent affidavit notices
12 of revocation?
13     A   Well, there's obviously a key issue here,
14 whether or not an officer can issue a temporary driver's
15 license unless both the officer and respondent sign. And
16 these are examples, and you can look at each one, where
17 none of these have a signature by the respondent, and yet
18 all of the boxes for temporary permit issued are checked
19 yes.
20     Q   Okay.
21     A   That's one part of it. The other thing is
22 that these -- many of these are issued by different
23 police agencies. And so it's not just one police
24 agency's way of doing it. It's the Parker Police
25 Department, Denver Police Department, Douglas County

Page 34

1  Sheriff's Office, the Wheat Ridge Police Department. The
2  Colorado State Patrol, which is an agency I know that was
3  brought up in these depositions quite a bit about
4  training, they have done that on two of these. It's the
5  State Patrol, at least, Boulder County Sheriff's
6  Department, and again, Colorado State Patrol. So there's
7  three in here from CSP.
8      Q  But, of course, you didn't have these when
9  you wrote your report?
10     A  I had these. I had pulled them. All but
11 two of these are from my old files --
12     Q  Okay.
13     A  -- closed cases. And so the reason -- I
14 mean, I was reading this, and then I decided I'm going to
15 go back and look at my cases and get specific examples,
16 because I know it happens all the time.
17     Q  Sure.
18     A  So I just pulled these probably in the
19 last week.
20     Q  What made you decide to start pulling
21 them?
22     A  The deposition coming up.
23     Q  How did you initially get retained for
24 this case?
25     A  I'm making an assumption. My office used

Page 35

1  to be right over here on the first floor for -- I was in
2  this building for 1989 to -- probably -- oh, probably
3  five years. And then at some point when I was in private
4  practice, I'm thinking like 1996 or so, I had an office
5  in Cherry Creek. And I was working for Larry Pozner
6  here. They called me back to work on another case with
7  them, and that lasted probably about three years. So
8  total time, I was in this building for eight years.
9          There's someone who also works in this
10 building who is not an attorney, investigator type. His
11 name is Tom McFarland. He knows me. He knows what my
12 background is. I'm assuming that somehow my name got
13 passed on to Sean.
14     Q  Who first called you?
15     A  I think Tom did -- or I don't know if it
16 was a call or an e-mail or something like that. It might
17 have been just, is this something you would be
18 interesting in looking at.
19     Q  Then did you have a meeting with
20 Mr. McDermott or other lawyers for Mr. Melton at some
21 point?
22     A  I met with Sean in this room for probably
23 an hour, yeah. And our contact has been probably
24 minimal.
25     Q  I guess what was your objective in writing

Page 36

1  the report?
2      A  My objective in the writing the report?
3      Q  Yeah.
4      A  To put my opinion down on hard copy.
5      Q  Do you consider yourself an advocate for
6  Mr. Melton?
7      A  I've never met the guy.
8      Q  In this case, are you someone advocating
9  for his position?
10         MR. McDERMOTT: Object to form.
11     A  I'm just stating my belief. If your side
12 would have called me up, I would have looked at the case,
13 also.
14     Q  (BY MR. SCOTT) Okay.
15     A  I've done both sides of this. It doesn't
16 matter which team you put me on. I'll do my best and
17 just lay it out there. If I would have looked at this
18 and said, You guys don't have a case here, I would have
19 told them that. I can tell you one thing, I'm losing
20 money being here, because I charge far less for this than
21 I would one of my regular cases.
22     Q  Actually, how much are you charging me for
23 this today?
24     A  I think we said like $200, and I probably
25 have like -- $200 an hour, and I probably have, like,

Page 37

1  seven hours of time into it.
2      Q  In terms of what you will bill me?
3      A  I don't know -- this is the first time
4  I've ever been deposed.
5      Q  Oh, okay. The general procedure is that
6  you'll bill me for the time you spend in deposition.
7  Your fee structure doesn't go into different -- experts
8  have different rule?
9      A  My hourly rate is about $300,000 an hour.
10     Q  Right.
11     A  I guess what I would bill them, the same
12 thing, $200 an hour.
13     Q  Okay. Of the 10,000 DUI cases that you've
14 been involved in, how many were as a police officer, or
15 do you have any estimate at all how many that would have
16 been?
17     A  I guess if I were going to break it down,
18 I'd probably say 1,000.
19     Q  You're going to teach CLE, you said, which
20 would be continuing legal education for lawyers, about
21 DUI stuff?
22     A  Uh-huh.
23     Q  What's the topic going to be of that
24 presentation?
25     A  It's supposed to be sort of like an update

Page 46

1  A  From what I saw in the paperwork.
2  Obviously I wasn't there, so relying on what I've read,
3  it appears to have been a valid refusal.
4  Q  How about the refusal to sign the
5  expressed consent affidavit and notice of revocation?  Do
6  you think Mr. Melton refused to sign the expressed
7  consent affidavit and notice of revocation?
8  A  Well, his signature is on it, so -- is not
9  on it, so obviously he did not sign it.
10  Q  Didn't sign it --
11  A  When you say "refusal" --
12  Q  Right.  But is your understanding of his
13  testimony and the facts of this case that Mr. Melton did,
14  in fact, refuse to sign it, not just that he didn't sign
15  it?
16  A  I don't know that I could make that
17  statement.
18  Q  You don't know that you could say whether
19  or not Mr. Melton refused to sign the expressed consent
20  affidavit?
21  A  Well, his signature is on it, so it's not
22  on it.  I'm assuming it was presented to him and his
23  signature is on it, so he did not sign it.
24  Q  Okay.  Have you read Mr. Melton's
25  deposition?

Page 47

1  A  I have.
2  Q  Let me refer you to page 121 --
3  A  Okay.
4  Q  -- line 123.
5  A  I actually have that highlighted.
6  Q  "QUESTION:  When Officer Moore asked you
7  to sign Exhibit 4, which is the expressed consent
8  affidavit, you refused to sign, correct?
9         ANSWER:  Yes."
10  A  Okay.
11  Q  So can we agree he refused to sign the
12  expressed consent affidavit and notice of revocation?
13  A  Yes.
14  Q  Okay.  So I guess now we get into the meat
15  of the matter, which is that, I guess, your contention in
16  paragraph 4 is, quote, This is in contravention of
17  Colorado law, closed quote, and you give a citation to a
18  Colorado revised statute.  And I guess what you're
19  referring to by, quote, this, unquote, is Officer Moore's
20  refusal to issue the temporary driving permit.  Am I
21  reading that correctly?
22  A  Correct.
23  Q  But I take it that -- I don't know, maybe
24  you can tell me if I'm wrong.  But when you say, "This is
25  in contravention of Colorado law," that's referring not

Page 48

1  only to what Officer Moore did in this situation, but
2  his -- what is described as his general practice to not
3  issue temporary permits in situations where people do not
4  sign.  Let me ask it again.
5         Are you alleging that as contravention of
6  Colorado law, not only for Officer Moore to in this
7  specific situation not issue a temporary driver's permit,
8  but that it's also a contravention of Colorado law to, as
9  a general practice, not issue temporary permits in
10  situations where people do not sign?
11  A  I'm sorry.  I lost you.  That seemed like
12  a compound question.
13  Q  I guess, tell me everything that's a
14  contravention of Colorado law.  That might be easiest.
15  A  My belief is and always has been that if a
16  person has a valid driver's license --
17  Q  Right.
18  A  -- and an officer takes their physical
19  license from them, the officer shall, and that's without
20  question, issue them the temporary permit, because it's
21  not a police officer's position to grant or deny someone
22  driving privileges.
23  Q  Right.
24  A  That has to happen after a hearing.  And
25  only the Department of Revenue can do that, not even a

Page 49

1  judge.
2  Q  Right.  And actually what you say is that
3  a police officer, in the situation you just described,
4  is, quote, Acting on behalf of the Department of Revenue,
5  closed quote.
6  A  Where are you referring to?
7  Q  That's also in paragraph 4.  Sorry.
8  A  Correct.
9  Q  So it's your contention that -- is the
10  officer acting, then, in a dual capacity as a police
11  officer and as an agent of the Department of Revenue, or
12  is he just acting as an agent of the Department of
13  Revenue as sort of a -- is he wearing a different hat
14  there or, what does that mean?
15  A  I think he's wearing two hats.
16  Q  Wearing two hats.  And I guess --
17  A  Let me qualify something.  The acronym,
18  DMV, I came up with years ago stands for Department of
19  the Many Variances, because the Department of Motor
20  Vehicles seems to do what they want a lot of times.  They
21  don't follow the law.  And so if they decide to put
22  whatever they want on one of their forms -- first of all,
23  I don't know who wrote this form.
24  Q  Right.
25  A  I don't know if it was an attorney down at

13 (Pages 46 to 49)